616 So.2d 114 (1993)
STATE of Florida, Appellant,
v.
Angela SWEET and William Davis, Appellees.
Nos. 91-02632, 91-02816.
District Court of Appeal of Florida, Second District.
March 24, 1993.
*115 Robert A. Butterworth, Atty. Gen., Tallahassee, and Erica M. Raffel, Asst. Atty. Gen., Tampa, for appellant.
Robert E. Jagger, Public Defender, and Bjorn E. Brunvand, Asst. Public Defender, Clearwater, for appellee.
PER CURIAM.
The state appeals an order of the County Court of Pinellas County dismissing charges of "disturbing a religious assembly." In so doing the county court held that the applicable statute, section 871.01, Florida Statutes (1991), is unconstitutionally overbroad and vague. We have jurisdiction; section 26.012(1), Florida Statutes (1991); and reverse.
The statute provides as follows:
Whoever willfully interrupts or disturbs any school or any assembly of people met for the worship of God or for any lawful purpose shall be guilty of a misdemeanor of the second degree... .
The same statute was upheld against claims of vagueness and overbreadth in S.H.B. v. State, 355 So.2d 1176 (Fla. 1977). In reaching a contrary conclusion the trial court acknowledged this holding but "adopt[ed]" the dissent of former Justices Hatchett and England. In particular, Justice England objected to the lack of a precise definition of the term "disturb," expressing his opinion that this "leaves it to the idiosyncrasies of the persons claiming to have been `disturbed.'" 355 So.2d at 1179. However, we are required, as is the trial court, to conform to the holding of the supreme court majority in S.H.B. Hoffman v. Jones, 280 So.2d 431 (Fla. 1973); State v. Hayes, 333 So.2d 51 (Fla. 4th DCA 1976).
This being said, we do not overlook the possibility of applying the statute in an unconstitutional manner. Conceivably, use of the statute to punish "words when used as a tool of communication" could offend constitutional guarantees of religious liberty and free speech. "Because of the innumerable situations and types of conduct involved, the question of what conduct is forbidden must be determined largely on a case-by-case basis." S.H.B., 355 So.2d at 1178. See, e.g., Weidner v. State, 380 So.2d 1286 (Fla. 1980), in which the supreme court rejected such a challenge in part because the accused had engaged in an altercation as well as speaking his mind. Accordingly, we have also reviewed the undisputed facts of this case, and find they are not sufficient to sustain dismissal on grounds of unconstitutional application of the statute.
The case originates in an apparent schism at the Mt. Pilgrim Missionary Baptist Church in St. Petersburg. The Rev. L.P. Davis, father of appellee William Davis, was hired as pastor when the church was founded in 1979. Appellee Davis sometimes addressed the church as an unofficial "assistant pastor." Appellee Sweet was also a member of the church.
For reasons not explained in the record, Rev. Davis was ousted by individuals purporting to represent a majority of the congregation and/or its governing board of deacons. Not all members supported this decision. One of the deacons, a Mr. Webb, testified that it was necessary to pursue formal eviction proceedings against Rev. *116 Davis, after which time the "anti-Davis" faction temporarily met and conducted services in the parsonage while Rev. Davis and his followers met on the steps of the sanctuary. The dispute became so acrimonious that the city began to station police officers inside the church. The trial court attached considerable significance to, and expressed extreme concern over, this fact. Those portions of the dismissal order are worth quoting in detail:
The worship services in this congregation were attended by St. Petersburg law enforcement officers for a period of at least six months. Taxpayer-paid, on-duty law enforcement officers were present at the directions of their command and the city administration in spite of a police department policy not to provide such continuing security forces.
Public schools located within the city of St. Petersburg pay off-duty officers out of school funds, not out of the city of St. Petersburg taxpayers' funds, for their presence during athletic and social events. Private businesses on a regular basis pay St. Petersburg off-duty police officers to be present as security. These law enforcement officers are paid out of the businesses' funds and not the taxpayers' funds. When religious associations and churches set carnivals or activities that need security, they are paid for by the associations, not by the taxpayers. Nothing in this finding of facts questions the integrity of the officers that testified, or their command. However, it does show a specific government intrusion into the operation of a religious body.
It appears that during the period of time the police were present, there was an ongoing conflict between members of the Webb and Davis factions of the congregation. Specifically, there was testimony of a very raucous or disruptive meeting, apparently initiated by the Webb faction banging pots, pans, and removing a microphone, these activities being at least as loud as the Davis faction's activities on July 15, 1990, the date in question.
* * * * * *
Our founding fathers were very protective of religious assemblies and religious beliefs. When they authored the Constitution of the United States it was an experiment and a unique concept in the world. Fresh in their minds [were] the "hundred year war" [sic] and the "thirty year war" [sic] in Europe where millions of people, sometimes whole towns and provinces, were killed because of religious differences. Cities were razed and the populations were destroyed over the interpretation of the same words in the Bible. They recognized quite well that .. . differences took place not only in the interpretation of scripture, but also on how the church or religious assemblies should be conducted.
* * * * * *
It is clear from the First Amendment in the Bill of Rights that our founding fathers wanted us to stay out of religious services. So did the people of the State of Florida, in Article I, Section 3, of the Declaration of Rights: "There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof."
This particular court can think of nothing more intrusive than for law enforcement officers to be sitting in a congregation every Sunday for approximately six months monitoring a dispute between two factions within the congregation. Their presence, fueling the resentment and frustration between the parties, the parties trying to decide which side those law enforcement officers were taking in the exercise of their religious freedoms and their religious rights. It is inconceivable to this court that our founding fathers could possibly approve of the stationing of law enforcement officers in a religious ceremony, especially on this continuing basis.
As noted in this order, the charges against appellees stem from an incident occurring July 15, 1990. The court, though careful to note it was not trying the case on its merits, heard testimony from Deacon Webb and others about the nature of the *117 incident. For purposes of this opinion we accept these facts as true.
As the parsonage congregation sang a hymn, appellee Davis "just came in and started on cutting across with his own song, nowhere with the group, saying people [were] going to hell for this ... more or less interrupting the service." According to Mr. Webb, regular church services were limited to "devotion and singing," and it was not expected that members would use this time to air grievances. Instead, anyone wishing to present complaints should request a "special meeting," and numerous such meetings were scheduled during "all the turmoil." Davis allegedly sang so loudly that "[e]verybody gave him the floor," then began lecturing those assembled about the injustice done to his father. Thereafter, according to Webb, the police officers in attendance attempted to calm Davis down, encouraging him to "act like the rest of the members." After Davis "finished his sermonette" he apparently left, returning during the closing prayer "to disrupt the process." Similar allegations were made against Ms. Sweet.
The trial court's concern about police intrusion into church services is consistent with our nation's long history of encouraging religious tolerance. Implicit in the order is the fear that the dispatch of police to this church, in addition to being wasteful of time and money, risked dissuading the free exercise of rights by certain worshippers. Nevertheless, the order criticizes policy decisions made by the city which are at most only marginally relevant to the question whether section 871.01 is constitutional. While one might dispute the wisdom of such decisions on a case-by-case basis, police officers are also "peace officers." We can conceive of situations where their presence in or around a church might be desirable, not to quell the spread of heresy or heterodoxy but to prevent violence. We might draw analogy to modern courthouses bristling with metal detectors and armed security guards  institutions once regarded as temples of justice now on occasion have become arenas of violence.
We do not speculate on the likelihood of violence actually occurring at the Mt. Pilgrim Church, except to observe that someone may have deemed it a possibility. If this is not the case  if more sinister motives impelled the police to that place  that still would not mandate the invalidation of a statute that can serve to deter unwarranted disorder and protect the safety of persons and property. Less drastic remedies are available to anyone thinking themselves or their rights infringed upon by the police in this case, such as injunctive relief against the governing faction of the church or even the department itself.
The trial court's comments also reflect skepticism about the quality of the proof to be offered by the prosecution in the event of a trial in this case. Since the court was also careful to remind the parties that the dismissal hearing was not intended to serve as a trial on the merits, we decline to prejudge the guilt or innocence of the appellees. Contrast Weidner v. State, supra, which reached the supreme court after trial on the merits, and in which the court determined that a judgment of acquittal should have been entered. We merely hold that the court erred in determining that the statute was facially unconstitutional or that it was shown to have been applied in an unconstitutional manner.
Reversed.
RYDER, A.C.J., and DANAHY and FRANK, JJ., concur.