Petitioner: Matthew Charles DEMPSEY,

v.

Respondent: The PEOPLE of
the State of Colorado.

No. 04SC362.

Supreme Court of Colorado,
En Banc.

June 27, 2005.

Rehearing Denied Aug. 22, 2005.*

* Justice MARTINEZ does not participate.

Holme Roberts & Owen, LLP, Bradford E. Dempsey, Denver, for Petitioner.

Musgrave & Thesis, LLP, Steven J. Perfrement, Denver, Nancy L. Dempsey, Arvada, Co-counsel for Petitioner.

Mary T. Keenan, District Attorney, Twentieth Judicial District, Adrian A. Van Nice, Deputy District Attorney, Boulder, for Respondent.

Justice BENDER concurs in part and dissents in part.

Justice MARTINEZ does not participate.

KOURLIS, Justice.

Matthew C. Dempsey petitions for relief from the order of the district court acting as an appellate court, sustaining his convictions in Boulder County Court for disrupting lawful assembly and obstructing a peace officer. The charges arose out of accusations that Dempsey had disrupted an election campaign rally and hindered the officers' attempt to issue him a summons for the disturbance. Dempsey appealed the denial of his motion for judgment of acquittal to the district court, challenging the sufficiency of the evidence and arguing that his convictions contravened constitutional guarantees of free speech and due process of law. The district court upheld the convictions and Dempsey petitioned for certiorari to this court.[1] We granted the petition and now reverse in part and affirm in part. We view the Colorado statute defining the crime of disrupting a lawful assembly as constitutionally applied in this case because the jury was instructed that it must find that the defendant intended the disruption and that a significant disruption occurred. Nonetheless, we hold that the evidence was insufficient to demonstrate that Dempsey's conduct did significantly disrupt the political rally. We therefore reverse Dempsey's conviction on that charge. As to the conviction for obstructing a peace officer, we conclude that there was sufficient evidence that the officers reasonably believed at the time of the incident that Dempsey had committed a crime and therefore were justified in detaining him for the purposes of issuing a summons; and that Dempsey's conduct, when viewed as a totality, constituted a knowing obstruction of that process. We sustain that conviction, and remand to the trial court for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

On October 26, 2002, Boulder County police arrested Matthew C. Dempsey on allegations of disrupting a lawful assembly,[2] and resisting arrest.[3] Dempsey subsequently

---

1. We granted certiorari on the following issues:
   1. Whether, in a matter of first impression, the District Court's broad application of Colorado's Disrupting Lawful Assembly statute, section 18–9–108, violated petitioner's fundamental rights, guaranteed by the United States and Colorado Constitutions, to free political expression at an election-related event.
   2. Whether, in a matter of first impression, the District Court's expansive application of Colorado's Obstructing a Peace Officer statute, section 18–8–104, violated petitioner's fundamental rights to due process as guaranteed by the United States and Colorado Constitutions by criminally punishing petitioner for exercising his legal rights while not under arrest.

2. § 18–9–108, 6 C.R.S. (2002).

3. § 18–8–103, 6 C.R.S. (2002).

moved to dismiss both charges on constitutional grounds, while the People moved to add an obstructing a peace officer charge.[4] The trial court denied the defendant's motion and granted the People's motion to add the additional charge.[5] The three charges were tried to a jury on May 6, 2003.

The events culminating in Dempsey's arrest began with an election 2002 campaign rally held at the Pearl Street Mall in Boulder, Colorado. The event was designed to promote several ballot initiatives and to provide various candidates, including Tom Strickland, Democratic candidate for the United States Senate, a forum. Strickland and one of his supporters, actor Robert Redford, were scheduled to address the crowd of 200 to 500 attendees. There was a stage on the Mall from which speakers, aided by amplified equipment, could address the crowd. A group of fifteen gymnasts, between the ages of eight and twelve, were performing on mats near the stage, to support Child Violence Alternative Week.

Dempsey was working with the campaign for the reelection of Republican Senator, Wayne Allard, the incumbent whom Strickland was challenging. Dempsey was among about fifteen Allard supporters who appeared at the rally, seeking to voice their opposition to Strickland's campaign. Dempsey, as the leader of his group, approached Officers Guzman and Gryniewicz, before the rally began, to inform them of his presence and his intent to present an opposing viewpoint. The officers informed Dempsey that he and his group could conduct their activity in a nonviolent manner, and admonished the group to remain separated a few yards from the Strickland campaign.[6] Dempsey left the rally and returned an hour later. At that point, the group included two individuals who wore

gasmasks, one who wore a "waffle-man" costume and two others who carried megaphones or bullhorns. The group carried several signs that read: "Toxic Tom", "Lawyer Lobbyist", and "Polluters' Lobbyist." Dempsey carried one of the bullhorns.

The nature and extent of the group's activities at the rally was the subject of conflicting evidence at trial. Dempsey testified that he and his group returned to the Mall around 3:00 p.m., the time of Strickland's scheduled appearance, though neither Strickland nor Redford had yet appeared. Several Boulder police officers were on foot patrol at the rally, including Officers Guzman, Gryniewicz, and Schelble. At the time of Dempsey's arrival, the gymnasts were performing on landing pads and mini-trampolines behind the stage. Dempsey said he and his group approached the stage, standing about ten feet from the gymnasts and separated from them by the crowd of rally attendees. He and one other person then spoke into the bullhorns. Dempsey yelled, "Lawyer Lobbyist" and "Toxic Tom," while the other Allard supporters repeated those words. The other person yelled into the second bullhorn, "Smokestack, smokestack, smokestack burn, let's see your tax returns!"

Dempsey testified that, immediately after those initial statements, Officer Guzman tapped him on the shoulder, telling him the bullhorn was "overkill" and Dempsey stopped using it.[7] Dempsey said he agreed that he was perhaps "going too far," testifying that the bullhorns were not usually an element of his presentation. He testified further that Officer Guzman then informed him that he could be arrested for assault for endangering the gymnasts. Dempsey responded that neither he nor any of his associates was close enough to touch the gymnasts.

---

4. Dempsey also filed a civil suit in the federal district court for the district of Colorado naming as defendants, among others, Boulder County District Attorney, Mary Keenan and the Boulder Police Department.

5. § 18–8–104, 6 C.R.S. (2002).

6. Dempsey testified that the officers refused to allow him to place Allard signs on the courthouse lawn even though Strickland campaign signs were posted there. The officers disputed

those allegations, stating that Dempsey had demanded that the Allard signs be allowed or he would remove Strickland signs. To avoid confrontation, the officers said the Allard signs were allowed.

7. Trial testimony indicated that Dempsey was at the rally for about twelve to fifteen minutes before the officers contacted him. However, no one testified he was using the bullhorn for that length of time.

Dempsey admitted that Officer Guzman informed him that he was being detained so that the officer could issue him a summons, and testified that he cooperated with the officer and never attempted to leave.

Dempsey said he then asked to speak with his lawyer, but was denied that opportunity. When asked to produce his identification, Dempsey said he complied after one officer took his signs and bullhorn away, allowing him to access his wallet more easily. While Officer Guzman inspected his license, Dempsey reached in his pocket for his cell phone and said he began to dial when the officers arrested him. He testified that he presumed he was being issued a summons for assaulting a gymnast.

The officers presented a different version of the incident. Officer Guzman testified that Dempsey's use of the bullhorn muffled the voices of rally speakers, such that the speakers could not be heard or understood. He added that he observed Dempsey "pushing people and children out of the way to get toward that stage." On cross-examination, Guzman said he saw Dempsey "push by children and adults." Officer Gryniewicz testified he saw Dempsey "barging his way" through the gymnasts, stepping on their mats. Officer Guzman stated he saw one mother grab her child and yell something at Dempsey. At that point, Guzman testified that he believed he needed to intervene. He approached Dempsey and asked to speak with him. Dempsey responded that it was his First Amendment right to be there. Officer Guzman asked Dempsey to move away from the crowd. He was then joined by Officer Gryniewicz.

Officer Guzman said he informed Dempsey that he had "crossed the line" by endangering the gymnasts. Dempsey denied having done so. The officer then asked to see Dempsey's identification. Dempsey asked whether he was under arrest. The officer informed Dempsey that he was detained until the officer could issue him a summons. Dempsey responded that he was calling his lawyer. The officer told Dempsey he would serve him a summons for disorderly conduct; Dempsey again said he was calling his attorney, and attempted to walk away, while placing his hand in his pocket. Officers Guzman and Gryniewiczs grabbed Dempsey's arms for officer safety. While Dempsey struggled to pull away, a cellular phone fell out of his pocket. The officer denied that he had threatened Dempsey with reckless endangerment or assault charges. He also denied that he had told Dempsey to refrain from using the bullhorn. The officers did agree that Dempsey stopped speaking into the bullhorn once they made contact with him.

Both Dempsey and Officer Guzman testified that in response to the Allard group activities, some rally attendees approached the group. Dempsey testified that some rally attendees clapped in response to his chants, assuming "we were with them." There was no testimony that any of the rally attendees complained to the officers. The officers also did not suggest that other attendees located further away from Dempsey and his group were unable to hear the rally speakers, who were at the time using amplified equipment setup for a large open-air audience. The officers themselves offered the only testimony that Dempsey and his group disrupted the rally.

Mayor William Toor, the mayor of Boulder, and Douglas Felkey, the coach of the performing gymnasts, were the only independent witnesses to testify at trial. Mayor Toor was in attendance in order to introduce Strickland at the rally. He denied hearing a bullhorn or witnessing any commotion. Felkey testified that he heard megaphones and saw someone clad in a waffle-man's outfit and other individuals with gasmasks, but he did not state that the bullhorns disrupted the rally or the gymnasts. Felkey also denied seeing anyone interfere with or strike any of the gymnasts. He denied that the gymnasts were forced to leave because of Dempsey's disturbance, noting that they routinely rolled up their mats and left immediately after a performance. Felkey testified that he saw a "scuffle" between Dempsey and the officers. Other than those individuals, no one who was in attendance at the rally testified.

At the close of the People's evidence, Dempsey moved orally for judgment of acquittal on all three charges. The trial court granted his motion solely as to the resisting

arrest charge, on the basis of insufficient evidence. The court denied his motion as to the other counts, although it found the question of whether Dempsey significantly disrupted the rally to be "a close call."

During the jury instruction conference, Dempsey proffered several instructions, primarily raising an affirmative defense relating to freedom of speech. He sought to have the court instruct the jury that they could only convict him if they found his activities were not protected by the state and federal constitutions. The trial court refused the proposed instructions, finding the statutes constitutional and the instructions potentially misleading. The court did allow Dempsey's theory of the case instruction, which argued that Dempsey was engaged in a constitutionally protected activity and therefore did not unlawfully disrupt the assembly or obstruct a peace officer.

The jury convicted Dempsey on both counts. He subsequently filed a written motion, reasserting his request for judgment of acquittal and challenging his convictions on grounds of insufficiency of the evidence. In support of his motion, Dempsey cited *Flores v. City and County of Denver*, 122 Colo. 71, 220 P.2d 373 (1950) and *In re Kay*, 1 Cal.3d 930, 83 Cal.Rptr. 686, 464 P.2d 142 (1970). He also argued that the obstructing a peace officer charge was untimely filed.

Considering the evidence in the light most favorable to the People, and finding substantial and sufficient evidence to support Dempsey's convictions beyond a reasonable doubt, the trial court denied the motion. The court agreed with Dempsey that his right to be on the Mall was a "critical" right; however, the court found that Dempsey had "simply crossed the line."[8]

Dempsey appealed the trial court's order, challenging the constitutionality of the respective statutes as applied to him, as well as the sufficiency of the evidence supporting both convictions.[9] Again, he offered *Flores* and *Kay* in support of his argument.

The district court rejected Dempsey's contentions of error, concluding, among other things, that the People had introduced testimony of police officers who testified that the bullhorn was so loud the speakers could not be heard; and that a reasonable jury could find from the officers' testimony that the bullhorn interfered with the event. The district court also rejected Dempsey's argument that he had merely exercised his constitutional rights, concluding that the defendant's rights did not permit him to interfere with the rights of Strickland supporters. The court found *Flores* distinguishable and refused to apply *Kay*, characterizing the latter opinion as the nonbinding authority of a different jurisdiction.

In addition, the court considered Dempsey's constitutional arguments: specifically, that the trial court committed errors of constitutional dimension by failing to give some of his tendered jury instructions; and that the obstruction statute was unconstitutionally applied to him. Addressing the first argument, the district court concluded that the trial court properly excluded the proposed instructions, particularly in light of the trial court allowing Dempsey his theory of the case instruction. Lastly, the court rejected Dempsey's contention that he was entitled to walk away from the officer given that he was not under arrest. The court, instead, found that the defendant's actions in response to

---

8. The trial court imposed a fine of $300 plus $159 in court costs. Dempsey does not challenge that sentence.

9. Dempsey lodged the following complaints with the Boulder County District Court:
   1. Due process mandates that Dempsey be acquitted of the disrupting lawful assembly charge given that the record contains no evidence that he actually "disrupted" any assembly;
   2. The unconstitutional application of the disrupting lawful assembly statute, section 18–9–108, against Dempsey by the Boulder Police, Boulder DA, and trial court require the

district court to acquit him of the disrupting lawful assembly charge;
   3. The Boulder DA and trial court violate Dempsey's right to due process of law by adding the new obstructing charge two business days prior to trial;
   4. The unconstitutional application of the obstructing a peace officer statute in this case by the Boulder Police, Boulder DA and trial court require the district court to acquit him of the obstructing charge; and
   5. The Boulder DA's misconduct in this case violated Dempsey's right to a fair trial and due process of law.

the officers' attempt to detain him to issue a summons justified the conviction.

Dempsey petitioned from the district court decision, arguing that the court's broad application of both statutes infringed upon his right of free expression. We granted the petition and now reverse the disrupting lawful assembly conviction, and affirm the obstructing a peace officer conviction.

## II. DISRUPTING A LAWFUL ASSEMBLY

■ The defendant argues that the application of the disrupting lawful assembly statute in this case violated his right to free expression under both the state and federal constitutions. He presents two arguments in support of his contention. He first argues that the statute is a content-based restriction, the application of which must be supported by a compelling state interest narrowly applied in the least restrictive manner possible, and justified by the least restrictive means of advancing the state's interest.[10] In connection with this argument, he posits, among other things, that the trial court should have given certain affirmative defense instructions to the jury. Dempsey next argues, in the alternative, that the evidence was insufficient to sustain the jury's conclusion that he "significantly" disrupted or obstructed the rally. On the latter point, we agree.

### A. The Statute is Not Unconstitutional As Applied to Dempsey

#### 1. Background

There is an undeniable tension between activity colloquially known as "heckling" and the right to carry on a lawful assembly. *See* Kevin Francis O'Neill & Raymond Vasvari, *Counter–Demonstration as Protected Speech: Finding the Right to Confrontation*

*in Existing First Amendment Law,* 23 Hastings Const. L.Q. 77, 78 (1995) (distinguishing "heckling" from "counter-demonstration"). Indeed, the tension is—to some extent—the point of heckling. The dissenters seek to draw attention to their activity and to present a contrasting viewpoint. *See Kay,* 83 Cal.Rptr. 686, 464 P.2d at 147; 1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 10:37 (2005); Eve H. Lewin Wagner, Note, *Heckling: A Protected Right or Disorderly Conduct?* 60 S. Cal. L.Rev. 215 (1986).

The United States Supreme Court has acknowledged that one of the goals of free speech may be to induce dissension. *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The goal, observed the Court, may be best served "when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Id.; Texas v. Johnson,* 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Although the Supreme Court has not directly determined whether heckling is a protected right, *see Wagner, supra,* at 216, state courts have generally held that "audience activities, such as heckling, interrupting, harsh questioning, and booing, even though they may be impolite and discourteous, can nonetheless be consistent with the thrust of the First Amendment," *Kay,* 83 Cal.Rptr. 686, 464 P.2d at 147; *State v. Ervin,* 40 S.W.3d 508, 515 (Tenn.Crim.App.2000) (declaring, "the right to assembly does not guarantee a silent meeting").

That principle is tempered, however, by the reality that "the state retains a legitimate concern in ensuring that some individuals' unruly assertion of their rights of free expression does not imperil other citizens' rights of free association and discussion."

---

**10.** We note that the defendant's argument is a restatement of the three-prong test the United States Supreme Court has established for evaluating the constitutionality of legislation that curtails certain fundamental liberties, including free speech. *See, e.g., United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). However, the defendant does not challenge the statute's constitutionality; rather, he challenges its application to the

facts and circumstances of this case. The defendant argues that the People prosecuted him because he was the group leader, and because he created an "unpleasant" or "negative atmosphere"—neither of which rise to compelling interests of the state. These arguments, together with his arguments that the officers did not employ the least restrictive means of curtailing his activity overlap with, and are resolved under his insufficiency of the evidence assertions.

*Kay,* 83 Cal.Rptr. 686, 464 P.2d at 149; *Morehead v. State,* 807 S.W.2d 577, 580 (Tex. Crim.App.1991). Thus, the state may legitimately enact and enforce laws designed to maintain that balance, so long as the laws are constrained to punish *conduct,* not *content* of speech.

## 2. Conduct, Not Content

Colorado's Disrupting Lawful Assembly statute proscribes the relevant conduct in the following manner:

> A person commits disrupting lawful assembly if, *intending* to prevent or disrupt any lawful meeting, procession, or gathering, he *significantly obstructs or interferes with the meeting,* procession, or gathering by physical action, verbal utterances, or any other means.

§ 18–9–108, C.R.S. (2004) (emphasis added). The question is whether this statute is sufficiently directed at conduct to comport with constitutional concerns.

The California Supreme Court reviewed its disruption statute in *Kay,* 83 Cal.Rptr. 686, 464 P.2d at 147–49, and found the statute susceptible to unconstitutional application absent certain protections in the form of jury instructions. The California statute reads in pertinent part: "[e]very person who, without authority of law, willfully disturbs or breaks up any assembly or meeting that is not unlawful in its character ... is guilty of a misdemeanor." Cal.Penal Code § 403 (West 2005) (proscribes "disrupting a public assembly or meeting"). The court in *Kay* directed that, in order for the statute to be applied constitutionally, the jury needed to focus on three questions: what was the nature of the assembly or meeting; did the defendant know, or should he have known, that his conduct violated an applicable custom, usage, or rule of that meeting; and did the conduct significantly disrupt the meeting or assembly. *Kay,* 83 Cal.Rptr. 686, 464 P.2d at 150.

Our statute does not fall prey to the pitfalls of the California statute in that it explicitly contains requirements that the defendant intends the disruption and that a significant disruption occurs. Hence, the elements of the statute itself largely address the *Kay* requirements.

The statute's requirement that a defendant "significantly" disrupted a meeting or assembly is seminal because through that word, the statute does import a conduct component.[11] We have previously interpreted a city ordinance directed at the same end, though not in the disrupting a lawful assembly context, to require a showing of "actual disturbance" to sustain a conviction. *Flores,* 122 Colo. at 73, 220 P.2d at 375 (addressing disturbing the peace ordinance that included limiting terms requiring that the disturbance be, among other things, "tumultuous" or "loud or unusual"). We reasoned that such an interpretation balanced the competing interests by protecting the peace of the residents of the Governor's Mansion against the right of citizens to "redress of grievance by remonstrance." *Id.*

We view the unlawful disruption statute as similarly focused on punishment for actual disruption. We note that, with minimal variations, other courts have likewise adopted an actual disruption standard. *See State v. Ervin,* 40 S.W.3d at 520 (whether a given conduct substantially impairs a meeting depends on the actual impact of the misconduct on the meeting); *State v. Linares,* 232 Conn. 345, 655 A.2d 737, 744 (1995) (construing disturbing legislative proceedings statute to require "specific intent to interfere with the legislative process; actual interference with the legislative process; and causal connection between the two"); *City of Spokane v. McDonough,* 79 Wash.2d 351, 485 P.2d 449, 450 (1971) (requiring further indication of the protester's intent to break up the meeting or otherwise deprive the speaker and the audience of their rights to hear and speak); *State v. Schwing,* 42 Ohio St.2d 295, 328 N.E.2d 379, 386 (1975) (classifying as disturbance of lawful assembly, those disturbances that "cause a lawful assemblage to terminate in

---

11. Here, the court gave no definition of "significant." Such a definition would assist juries in the future in determining whether the defendant's disruption falls within the range contemplated by the statute. In this context, "significant" means "conduct that effectively impaired, interfered with or obstructed the due conduct of the meeting in a consequential, significant or considerable manner." *See State v. Brand,* 2 Ohio App.3d 460, 442 N.E.2d 805, 811 (1981).

an untimely manner"). Appropriately, the statute, thus, focuses on the conduct of the defendant—not the content of his speech. Accordingly, we conclude that the Colorado statute, because of its language, can be applied in a manner consistent with constitutional concerns, and was so applied in this case.

## B. Affirmative Defense Jury Instruction

The defendant argues that the statute could only be narrowly and constitutionally applied if the jury were instructed that his right to free expression was an affirmative defense to the charge. We disagree.

We find no error in the trial court's rejection of the defendant's tendered instructions, which would have interposed an absolute affirmative defense that the defendant engaged in the constitutionally protected expression of speech.[12] Such an affirmative defense would entirely negate the careful balancing inherent in the statute and in cases interpreting similar statutes. *See People v. Huckleberry,* 768 P.2d 1235, 1238 (Colo.1989) (defining affirmative defense). The defendant did *not* have an absolute right to do or say whatever he chose under the guise of freedom of expression. Were we to approve such an affirmative defense, the defendant's constitutional rights to free speech would be elevated over those of the speakers and other participants, without any weighing of competing considerations.

## C. Sufficiency of the Evidence

We now turn to defendant's argument that the People introduced insufficient evidence to sustain his disruption conviction. The trial court denied Dempsey's motions for judgments of acquittal under Crim. P. 29. The district court upheld that ruling on appeal. Dempsey petitioned for certiorari from that order. Given that procedural posture, we review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the convictions. *People v. Waggoner,* 196 Colo. 578, 595 P.2d 217 (1979). The prosecution has the burden of establishing a prima facie case of guilt, which requires introduction of "sufficient evidence to establish guilt—no more, no less." *People v. Bennett,* 183 Colo. 125, 130, 515 P.2d 466, 469 (1973). We have adopted the substantial evidence test, requiring that the evidence viewed in the light most favorable to the prosecution, be both " 'substantial and sufficient' to support the defendant's guilt beyond a reasonable doubt." *Id.* at 469; *People v. Batchelor,* 800 P.2d 599, 604 (Colo.1990). We also review the trial court's rulings on questions of law de novo. *Lewis v. Colorado Rockies Baseball Club, Ltd.,* 941 P.2d 266 (Colo.1997).

We therefore proceed to examine the evidence in this case to determine whether it satisfies the *Kay* three-pronged analysis.

### 1. Intent

Under the terms of our statute, the defendant must intend to disrupt the meeting. That element of the offense subsumes two notions that other courts, beginning with *Kay,* have identified as appropriate inquiries. First, the nature of the assembly or meeting defines the bounds of appropriate protest. The standard is drawn "from the implicit customs and usages or explicit rules germane

---

**12.** Dempsey proposed, in pertinent part:

1. A supplement to the disrupting a lawful assembly charge instructing the jury that if each element of the offense is proved beyond a reasonable doubt, he should be convicted unless the jury finds "the defendant has asserted an affirmative defense."

2. An instruction that "[i]t is an affirmative defense to the crime of disrupting a lawful assembly ... that the Defendant engaged in the constitutionally protected expression of speech on the Boulder Mall in support of his political beliefs" under the federal and state Constitutions;

3. An instruction that "[e]xpression of conservative or Republican political views frequently invites disputes in Boulder, CO," but "is nevertheless protected from government infringement;"

4. Two instructions that even offensive or unpopular speech are protected by the state and federal constitutions and are not "automatically prohibited" and;

5. That it is an affirmative defense to the crime of disturbing a lawful assembly that the defendant engaged the conduct under mistaken belief that it did not constitute a crime and was protected by the state and federal constitutions.

to a given meeting." *Kay*, 83 Cal.Rptr. 686, 464 P.2d at 151; *State v. McNair*, 178 Neb. 763, 135 N.W.2d 463, 465 (1965) (declaring that "what constitutes disturbing a lawful assembly is not susceptible to specific definition but must depend to some extent on the nature and character of particular assemblage"). For example, while "the customs and usages at political conventions may countenance prolonged, raucous, boisterous demonstrations as an accepted element of the meeting process;" the same activity would offend "the customs and usages of a church service." *Kay*, 83 Cal.Rptr. 686, 464 P.2d at 150. Courts generally distinguish between an "open-air" meeting or assembly, and a "closed" or otherwise private affair. *See id.*, 83 Cal.Rptr. 686, 464 P.2d at 145 (a large July 4th celebration held at a public park contemplates opposing view points); *McDonough*, 485 P.2d at 449 (assertion of opposing view point not unusual at political rally held at downtown plaza); *State v. Sweet*, 616 So.2d 114 (Fla.Dist.Ct.App.1993) (defendant singing nonconforming songs at religious service not protected speech); *State v. Hardin*, 498 N.W.2d 677, 681 (Iowa 1993) (a paid political event held in an auditorium weighs against protecting boisterous opposing view points); *Carlson v. City of Tallahassee*, 240 So.2d 866 (Fla.Dist.Ct.App.1970) (upholding disturbing the peace conviction against protester who refused to abide by rule that no signs were permitted inside municipal stadium reserved by political party to promote its own candidates); *Linares*, 655 A.2d at 741 (speech given in Gallery of Halls of the House of Representatives is not a "public event"); *Morehead*, 807 S.W.2d at 579 (a structured sorority meeting at a convention center does not anticipate protest).

As one court has noted, at a noisy open-air, partisan event, where banners, and slogans and shouting are involved, and the crowd is tacitly invited to demonstrate its approval of the speaker and his party through applause, cheers and friendly expletives; it is to be expected that those of opposing views in the audience are likely to convey vociferously their disapproval in an orderly but vocal way. *McDonough*, 485 P.2d at 450.

In this case, the event was a political campaign rally held in an open-air venue. The rally was conducted at the Pearl Street Mall in Boulder, a downtown outdoor location, and was centered on support for various ballot initiatives and congressional candidates. Tom Strickland, a candidate for United States Senate, was scheduled to speak. Signs supporting candidates were planted on the nearby courthouse lawn and supporters of candidates were carrying similar signs. The event was opened to the public, and people could come and go at will. The preponderance of the attendees were supporters of candidate Strickland.

At such an event, the custom or usage anticipates that persons with opposing views would appear and seek to voice opposition either to the ballot initiatives or the speakers. Indeed, "it is rare where controversial topics are discussed that an outdoor crowd does not mutter, mill about, push, shove, or disagree ... with the speaker." *See Schwing*, 328 N.E.2d at 385. Therefore, the nature of the meeting in this case anticipates dissent—even disruptive dissent. However, that conclusion does not resolve the issue. Obviously, even in the case of an outdoor rally, some conduct may exceed the bounds of permissible dissent. The defendant's conduct may nevertheless violate the statute if he was aware of the likelihood that his conduct exceeded the customs of such a rally and substantially interfered with it.

Once the nature of the event is clear, the second question becomes whether the defendant intended to disrupt that event—or, stated otherwise, whether the defendant was aware that his conduct was inconsistent with the customs of the assembly and whether he thereby intended his conduct to disrupt the assembly significantly. Although the record does not indicate whether members of the audience other then Dempsey and his associates carried or used bullhorns, the record does reflect that the officers did not initially tell Dempsey that he could not use the bullhorn. Dempsey did admit at trial that he did not normally use a bullhorn at rallies, thereby demonstrating some awareness on his part that his conduct was inappropriate for such an event. On the other hand, we cannot

say as a matter of law that the use of a bullhorn at a noisy open-air political rally falls outside the range of acceptable protest activity at such an event. *Cf. Ervin,* 40 S.W.3d at 520 (use of bullhorn to shout, "Stop killer cops!" exceeded permissible conduct at funeral service commemorating police officer); *Hamilton v. City of Montrose,* 109 Colo. 228, 230, 124 P.2d 757, 758 (1942) (defendant speaking into loud speaker, broadcasting his preaching and announcements of religious services on main business streets during business hours). One might certainly envision circumstances where even supporters at the rally could use bullhorns to chant support. Instead, we must determine whether the evidence at trial proved that Dempsey's use of the bullhorn actually impaired or otherwise significantly disrupted the rally.

### 2. Significant disturbance

Even viewing the evidence in the light most favorable to the People, we are not satisfied that the People introduced sufficient and substantial evidence to prove beyond a reasonable doubt that Dempsey significantly obstructed the rally. The People suggest two alternative theories of conduct that would support the conviction: speaking into the bullhorn, and disrupting the gymnasts. The evidence is not sufficient and substantial on either ground.

Dempsey testified that he was contacted by police after he spoke two phrases into the bullhorn, "Lawyer Lobbyist" and "Toxic Tom." The People presented evidence that the defendant was at the rally for twelve to fifteen minutes before the officers contacted him, and then, attempted to infer from that temporal evidence that the defendant was using the bullhorn for the entire period. However, no witness for the People suggested that to be the case; and significantly, none of the officers made any assertion to that effect. *See Linares,* 655 A.2d at 746 (citing time, duration and intensity of disruption). Moreover, no prosecution witness testified that Dempsey had persisted in using the bullhorn after he was told to stop. Officer Guzman even denied that he had admonished Dempsey to stop using the bullhorn. *See Kay,* 83 Cal.Rptr. 686, 464 P.2d at 152

("in circumstances where the appropriate standard of conduct lies in doubt, a warning and a request that defendants curtail their conduct, either by officials or law enforcement agents should precede arrest or citation"); *Hardin,* 498 N.W.2d at 678–9 (noting arrest consistent with protocol established by event organizers whereby any one disrupting the speech would be asked to sit down and be quiet, asked to leave if they did not do so, and arrested by city police officers only as a last resort); *State v. Brand,* 2 Ohio App.3d 460, 442 N.E.2d 805, 811 (1981) (citing three separate requests by police for defendant to be quiet).

Furthermore, the record contained insufficient evidence from attendees to establish significant disruption. Dempsey did testify that in response to his use of the bullhorn, some members of the crowd clapped and others approached his group. There was no evidence that the rally stopped, or was interrupted. We note further that, other than the three officers who approached Dempsey, there is no other evidence of individuals who complained about Dempsey. Certainly, testimony from the arresting officers is probative, but not dispositive on the issue of whether the disruption was "significant." Between 200 and 500 people were in attendance; two other individuals testified, and neither indicated that the bullhorn disrupted the rally. The officers approached Dempsey and stood in the vicinity of the bullhorn. Their testimony, without more, cannot support a conclusion of significant disruption. In addition, we note that Officer Guzman stated in his arrest affidavit and at trial that he only recognized the need to intervene when he saw Dempsey and his group endanger the performing gymnasts; and not because he was disrupting the assembly by speaking into the bullhorn.

Finally, the evidence indicated that at the time the defendant spoke into the bullhorn, the primary speaker, Strickland, had not appeared on stage (nor had Robert Redford). Mayor Toor, who introduced Strickland, testified he did not hear or witness any disturbances. The record is undisputed that Dempsey's activity was directed at Strickland. Yet no evidence at trial indicated that

Strickland's speech was interrupted, even minimally, by Dempsey's display.

With respect to the theory that the evidence is sufficient to support the conviction on the basis that the defendant disrupted the gymnasts, Officer Guzman wrote in the arrest affidavit that Dempsey:

> Pushed the children aside as they were jumping and landing on the pads. Officer Gryniewicz and I saw this. I believe that this placed the children in danger, because any one of the children could of [sic] landed on the ground possibly causing severe injury. Mr. Dempsey and his group did not seem to care about this as they stood on the pads and continued to disrupt the Strickland campaign ... I told him he crossed the line when he placed the children who were doing gymnastics demonstration in danger.

At trial, the coach of the gymnasts, Felkey, provided testimony contradicting Guzman's contentions that the defendant had endangered the gymnasts. Felkey testified that his attention was focused on the gymnasts "at all times." He denied seeing the defendant or members of his group step on their pads and also denied that the group was forced to leave as a result of the defendant's activities. In fact, Felkey testified that the gymnasts usually collect their equipment and vacate the scene immediately after performances.

Felkey's testimony on that point was seminal. He was charged with supervising the gymnasts, and had every reason to be paying close attention. Furthermore, the People never argued that the assembly Dempsey was charged with disrupting was the gymnastics performance itself. Rather, the allegation was that Dempsey's actions with respect to the gymnasts disrupted the larger rally. No one testified that anything that occurred between Dempsey and the gymnasts disrupted the rally.

At bottom, the evidence justifying the defendant's conviction for obstructing a lawful assembly was not sufficient. The trial court declared the matter a "close call." We therefore reverse the defendant's conviction for disrupting a lawful assembly.

## III. OBSTRUCTING A PEACE OFFICER

Dempsey makes a series of constitutional arguments regarding his conviction for obstructing a peace officer. Basically, he argues that everything he did was constitutionally protected and cannot form the basis of a conviction for obstruction. To the contrary, we conclude that the evidence is sufficient to support the jury's verdict that Dempsey knowingly obstructed enforcement of the penal law as required by the statute, and we therefore sustain the conviction.

### A. Physical Interference or Use of an Obstacle

Obstructing a peace officer is defined in the following manner:

> A person commits obstructing a peace officer ... when by using or threatening to use violence, force, physical interference, or an obstacle, such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority.

§ 18–8–104(1)(a), C.R.S. (2004).[13]

As the defendant notes, the statute identifies specific means by which his conduct might obstruct a peace officer. Pertinently, since there was no allegation of actual force or violence, the defendant must have used "an obstacle" or "physical interference" to obstruct the officer's performance of his duty. The statute provides some guidance as to the meaning of "obstacle," and "physical interference" since it requires conduct that is of sufficient magnitude to "obstruct, impair or hinder" enforcement of the officers' duty. The obstacle or physical interference may not be merely verbal opposition. *See Norwell v. City of Cincinnati*, 414 U.S. 14, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973) (holding that

---

13. We note that the jury instruction omitted a portion of the statute, to wit: "A person commits obstructing a peace officer ... when, *by using or threatening to use violence, force, physical interference, or an obstacle,* such person ...." However, no party raised that omission at any point in this proceeding, and we thus decline to address it.

"one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer"); *State v. Srnsky,* 213 W.Va. 412, 582 S.E.2d 859, 868 (2003) (declaring, "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state").[14]   However, while individuals may not be punished for mere verbal opposition to police authority, the statute does include within its ambit "use" as well as "threat" of physical interference or obstacle.   Thus, whereas mere remonstration does not constitute obstruction, conduct constituting use or threats of "physical interference" or "an obstacle" do.

Although no cases exactly address the facts presented in this case, the consensus among courts grappling with similar statutes is that where the statute punishes both "threats" and "use" of physical interference and obstacle, neither "physical contact" nor actual physical interference is required.   *See* Christopher Hall, Annotation, *What constitutes Obstruction or Resisting Officer, in Absence of Actual Force,* 66 A.L.R. 5th 397 (1999) (noting that state obstruction and resisting arrest statutes do not require physical altercation).   Michigan, for instance, adopted the view that "actual physical interference is not necessary because case law instructs that an expressed threat of physical interference, absent actual physical interference is sufficient . . . ." *See People v. Philabaun,* 461 Mich. 255, 602 N.W.2d 371, 375 (1999).   In addition, the court preferred to evaluate each case on its own facts, noting that in some instances, even verbal conduct absent threat may be sufficient "if coupled with refusal to comply with the officer's or-

ders." *Id.* Accordingly, actual physical interference is not a prerequisite to conviction, as long as the suspect's *actions* are "calculated in any appreciable degree to hamper or impede the police in the performance of their duty as they saw it." *See State v. Manning,* 146 N.J.Super. 589, 370 A.2d 499, 503 (App. Div.1977); *see also Brown v. City of Danville,* 44 Va.App. 586, 606 S.E.2d 523, 529 (2004) (holding obstruction does not require actual or technical assault upon the officer but does require an "act clearly indicating an intention on the part of the accused to prevent the officer from performing his duty, as to 'obstruct' ordinarily implies opposition or resistance by direct action.").   Likewise, in construing a statute similar to ours, the Nebraska Supreme Court required proof of "physical conduct' in the sense that it was an act which had material, substantive, and objective existence." *See In re Richter,* 226 Neb. 874, 415 N.W.2d 476, 478 (1987).   The court made clear, however, that "physical interference" need not be "physical contact," and may include flight in disobedience of the officer's lawful order to stop. *See id.; State v. Owen,* 7 Neb.App. 153, 580 N.W.2d 566 (1998); *see also People v. Vargas,* 179 Misc.2d 236, 684 N.Y.S.2d 848, 850 (Crim.Ct. 1998) ("physical interference" does not require "physical contact").

Thus, although mere verbal opposition alone may not suffice, a combination of statements and acts by the defendant, including threats of physical interference or interposition of an obstacle can form the crime of obstruction.   The statute clearly targets conduct by the defendant evidencing both that he employed or threatened use of "physical interference" or an "obstacle" and that he "knowingly" obstructed the enforcement of

14.   The Model Penal Code expresses similar policy basis for a narrow construction.   The drafters state, "The judgment underlying[ ] curtailment of coverage is that authorizing criminal punishment for every trivial act of resistance would invite abusive prosecution." *See* M.P.C. § 242.1, Explanatory Note for §§ 242.1–242.8. The drafters therefore exclude from the code's range, liability for "nonviolent refusal to submit to arrest and such minor acts as running from a policeman or trying to shake free of his grasp." *See* M.P.C. § 242.1 ("A person obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference, or obstacle, breach of official duty, or any other unlawful act.").   Like the drafters of the M.P.C., by punishing "physical interference" or an "obstacle", the Colorado General Assembly envisioned a limited range of conduct for which the defendant may be punished.   Unlike the M.P.C., however, the statute punishes "threats" as well as "use" of physical interference or obstacle. Thus, the General Assembly therefore intended to include a broader range of conduct by the defendant that leads to obstruction.

the penal law by a peace officer who was "acting under color of official authority." Consequently, the People have the burden of demonstrating that the officer had the authority to issue the commands at the time of the encounter and that the defendant had a corresponding obligation to comply. We find sufficient evidence in the record to support that conclusion.

## B. Sufficient Evidence of Obstacle or Physical Interference

The obstruction statute contains the essential elements that the defendant knowingly obstructed the "enforcement of the penal law" by an officer acting under "color of official authority." "Penal Law" ordinarily refers to law which imposes a penalty. *See People v. Shockley,* 41 Colo.App. 515, 516, 591 P.2d 589, 591 (1979). The term "enforcement" in the statute includes "those activities which a peace officer is under a duty to perform in order to give effect to the penal law." *See id.,* 591 P.2d at 591. An officer is authorized to "stop any person who he reasonably suspects is committing, has committed, or is about to commit a crime . . . to give his name and address, identification if available, and an explanation of his actions." *See* § 16-3-103(1), C.R.S. (2004); *see also People v. Archuleta,* 616 P.2d 977, 980 (Colo.1980) ("The police may detain and require identification of a person if they have a reasonable suspicion, based on objective facts that the person is involved in criminal conduct."). We have held that [t]o justify such a limited intrusion, a police officer must have an articulable and specific basis in fact for suspecting that criminal activity has occurred or is about to take place . . . ." *See People v. Wells,* 676 P.2d 698, 701 (Colo.1984). Thus, the officer's command must be attached to performance of an official function such as an investigatory stop that is justified by articulable basis in fact.

Additionally, the officer must be acting under "color of official authority." As such, the People must demonstrate that the officer exercised "judgment in good faith based upon surrounding facts and circumstances that *an arrest should be made by him.*" § 18-8-103(2) (defining "color of official authority) (emphasis supplied). Importantly, "color of official authority" does not require that the defendant be placed under custodial arrest in the traditional sense of that term to trigger the possibility of obstruction charges. Under Colorado law, "arrest" includes noncustodial arrests, which involve only temporary detention for the purpose of issuing a summons. *See People v. Bland,* 884 P.2d 312, 316 (Colo.1994).

The evidence at trial proved that Dempsey refused to cooperate with the officers in several ways: (1) Dempsey refused to provide his identification for the officers to write him a summons; (2) Dempsey stated repeatedly, instead, that he needed to speak with his lawyer; (3) Dempsey walked away, placing his hands in his pockets; and (4) he struggled with the officers after they had grabbed his arms for their own safety, still refusing to cooperate with their attempts to issue him a summons.

Dempsey would have this court analyze each segment of conduct separately, emphasizing the question of whether he had the legal right to engage in each activity. That approach is neither legally nor practically correct. The governing analysis looks to the totality of the circumstances, not segregated instances.[15] That totality analysis similarly controls the appellate review of whether the officer made a "good faith" determination that the defendant should be arrested. *See People v. Altman,* 938 P.2d 142 (Colo.1997) (applying objective reasonable standard).

15. Indeed, application of the standard urged by Dempsey is even unsupported by the authority on which he relies. For instance, he cites *Enright v. Groves,* 39 Colo.App. 39, 560 P.2d 851 (1977), in which the court of appeals held that failure to provide identification does not constitute a crime. However, that case did not involve the obstruction statute and is distinguishable for other reasons as well: the officer did not convey that they required the defendant's identification for purpose of issuing a summons, and the defendant did not attempt to leave the scene or struggle with the officers. Likewise, *Buckley v. American Constitutional Law Found., Inc.,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) is also inapposite. In that case, the Court struck a Colorado statute that required persons circulating initiative petitions to wear identification badges.

Here, the evidence, when viewed in its totality, indicates that the officers saw Dempsey speaking into a bullhorn and moving rapidly through the crowd. The officers observed Dempsey for several minutes before approaching him. They testified that they believed he was endangering the gymnasts and interfering with the rally. Upon contacting him, the officers asked to speak with Dempsey away from the crowd. Dempsey initially objected. The officers stated their reasons for seeking to issue him a summons. Dempsey continued to resist, exceeding the bounds of lawful conduct by mounting several roadblocks to the officers' execution of their duty. Dempsey refused to comply with the officers' requests for identification; and he sought to walk away from the officers, repeatedly stating that he wished to call his attorney. Lastly, he reached into his pocket in a manner that the officers later testified they believed to be potentially threatening.

We emphasize that, for purposes of this analysis, we need not conclude, based on later trial evidence, that Dempsey actually committed the crime for which the officers sought to detain him. We look, rather, to whether, at that moment in time, the officers had a sound articulable suspicion of criminal activity. The evidence sufficiently supported the conclusion that the officers had such a suspicion, and that Dempsey's conduct violated the obstruction statute.

## III. CONCLUSION

We hold that our disrupting lawful assembly statute was constitutionally applied in this case, but the People nonetheless failed to present substantial and sufficient evidence to prove that the defendant significantly disrupted a lawful assembly beyond a reasonable doubt. We therefore reverse Dempsey's conviction for that offense. On the other hand, we accept neither the legal nor the factual assertions of the defendant as to the conviction for obstructing a peace officer, and accordingly sustain that conviction. We remand the case to the trial court for further proceedings consistent with this opinion.

Justice BENDER concurring in part and dissenting in part.

To be consistent with First Amendment principles, the majority applies the three elements test articulated in the seminal case of *In re Kay*, to determine that Dempsey's conviction for disrupting a lawful assembly is not supported by sufficient evidence. 1 Cal.3d 930, 83 Cal.Rptr. 686, 464 P.2d 142 (1970). However, the majority fails to require, as *Kay* does, that the jury consider these very same elements in a prosecution for disrupting a lawful assembly when the defendant claims he is exercising his constitutionally protected free speech rights. *Id.*, 83 Cal.Rptr. 686, 464 P.2d at 153. In my view, *Kay* protects a defendant's fundamental First Amendment guarantees in a criminal prosecution for disrupting a lawful assembly by ensuring that a defendant be criminally punished for his conduct and not for the content of his expression. Thus, I would apply the full *Kay* holding to this case and require that the jury be instructed on all the elements, not simply those found in the Colorado statute. Therefore, while I concur in the majority's conclusion that there was insufficient evidence to convict Dempsey for disrupting a lawful assembly, I respectfully dissent to part II A 2 of the opinion because I do not believe that the statute, as written, can be applied in a constitutional manner.

The First Amendment contains competing constitutional principles. It protects the rights of people to gather peacefully in a public meeting while at the same time protects the rights of dissenters to speak up and express disapproval of the very assembly which is protected. "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excess of anarchy." *Cox v. Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). Neither right is more important than the other and each should be guarded closely.

Legislatures, such as Colorado's, have enacted statutes that protect the rights of those

who have lawfully assembled from having their assembly disturbed by an unruly contingent of malfeasants. Section 18–9–108 provides that a person disrupts a lawful assembly if he intends to disrupt a meeting by significantly obstructing or interfering with the meeting by any means.[1] These statutes have not gone without thorough examination from the courts to assure that a defendant who is charged under such a statute is not punished for the message he delivers but for the conduct that occurs.

In a similar case, the California Supreme Court wrestled with the application of a disruption statute[2] to a group of individuals who engaged in clapping and shouting during a Congressman's speech at a Fourth of July celebration. *Kay*, 83 Cal.Rptr. 686, 464 P.2d at 145. That court recognized that "[a]udience activities, such as heckling, interrupting, harsh questioning, and booing, even though they may be impolite and discourteous, can nonetheless advance the goals of the First Amendment." *Id.*, 83 Cal.Rptr. 686, 464 P.2d at 147. But, at the same time, "the state retains a legitimate concern in ensuring that some individuals' unruly assertion of their rights of free expression does not imperil other citizens' rights of free association and discussion." *Id.*, 83 Cal.Rptr. 686, 464 P.2d at 149.

Thus, in order to apply the disruption statute in a constitutional manner, that court required three elements to be met: 1) the defendant must have substantially impaired the conduct of the meeting; 2) by an intentional act; and 3) in violation of implicit customs or explicit rules of the meeting or lawful assembly known by a reasonable person. *Id.*, 83 Cal.Rptr. 686, 464 P.2d at 150; *McMahon v. Albany Unified School Dist.*, 104 Cal.App.4th 1275, 129 Cal.Rptr.2d 184 (2002) (dumping trash not a legitimate element of school board meeting held in elementary school cafeteria).[3]

Turning to the language of our disruption statute, it only requires that the defendant intend to prevent or disturb a meeting by "significantly obstruct[ing] or interfere[ing] with the meeting." § 18–9–108. There is no requirement that the jury also consider the defendant's conduct in light of the nature of the assembly and whether his conduct, and not his speech, violates the customs or rules of that assembly or meeting.

This third requirement identified in *Kay* provides the necessary element for a jury to balance the free speech rights of a defendant and the rights of others to assemble. Without this requirement it is entirely conceivable that a person could be convicted for disruption simply by expressing a dissenting view at a public meeting. The person has the intent to disturb the meeting by expressing a discordant view, and may either speak for a long time, or bring to light new information, which interferes with or may even stop the meeting.[4] Thus, while the individual participated in the meeting in the same manner as all the others, a jury could convict based on

---

1. Section 18–9–108 states:

   A person commits disrupting lawful assembly if, intending to prevent or disrupt any lawful meeting, procession, or gathering, he significantly obstructs or interferes with the meeting, procession, or gathering by physical action, verbal utterance, or any other means.

2. I agree with the majority that the disruption statute in *Kay* is different from Colorado's in that it does not require that the defendant intend to disrupt the assembly or that a significant disruption occur. California Penal Code section 403 states: "Every person who, without authority of law, willfully disturbs or breaks up any assembly or meeting, not unlawful in its character, … is guilty of a misdemeanor." *Kay*, 83 Cal.Rptr. 686, 464 P.2d at 146. However, the inclusion of some, but not all, of the factors articulated in

*Kay* does not eliminate my concern that the statute may be unconstitutionally applied.

3. A number of other state courts have followed this three part balancing test set forth in *Kay*. *See e.g.*, *State v. Ervin*, 40 S.W.3d 508 (Tenn.Crim. App.2000); *State v. Hardin*, 498 N.W.2d 677 (Iowa 1993); *Morehead v. State*, 807 S.W.2d 577 (Tex.Crim.App.1991); *State v. Schwing*, 42 Ohio St.2d 295, 328 N.E.2d 379 (1975); *City of Spokane v. McDonough*, 79 Wash.2d 351, 485 P.2d 449 (1971).

4. *See State v. Kane*, 303 N.J.Super. 167, 696 A.2d 108, 115 (App.Div.1997) (principal disturbance was caused by the police arresting and removing the defendant from public meeting after the defendant loudly asked to be recognized and was refused by the chairman; thus, application of the disturbance statute violated the defendant's free speech rights).

the outcome of the defendant's speech and not his conduct. Or, as contemplated by the facts in this case, a person may express a dissenting view at a political rally which obstructs the message delivered by the main speaker. However, in such instances, the person's conduct of yelling at the speaker at an inopportune time during the speech is no different than where the speaker's supporters clap, cheer, and make other noises in support of the speaker.

The individual becomes powerless to express his beliefs when the government punishes him for speaking out against the views of others. While the First Amendment protects the right to assemble, it also protects the right of the individual to protest that very assembly. For some, this may be the only way in which they are able to express their views. Therefore, a careful balancing is required to ensure that a conviction is based upon the defendant's active conduct and not the content of his speech.

Thus, it is critical that the jury consider the defendant's conduct in light of the type of assembly. Under the plain language of our disruption statute, a defendant could be convicted for speech that is constitutionally protected because the jury is not required to consider this critical third element. To avoid this possible outcome, the jury must consider the nature of the meeting or gathering and the level of disruption that could be expected—not simply whether a person's behavior is discourteous or rude and thus disrupts the assembly or meeting which, by its very nature, may be a disorderly event. *State v. Ervin,* 40 S.W.3d at 519 ("A level of disruption to be expected at an outdoor political gathering . . . is not what would be reasonably expected at a memorial for slain officers." (Internal citations omitted)).

The majority applies the complete *Kay* standards to determine whether there was sufficient evidence to support a conviction but does not require that the jury be instructed on those standards. According to the majority opinion, an appellate court is to apply the *Kay* balancing test to determine if there is sufficient evidence to uphold a conviction. However, a jury is not required to consider this heightened standard when deciding whether to convict. For purposes of judicial economy and to protect a defendant's first amendment rights, it is only logical that the jury should also be instructed concerning the very same elements used to review for the sufficiency of the evidence. Only in this way can a protestor's conviction rest on firm constitutional grounds and be based upon actual conduct and not the content of protected speech.

In addition to the statutory requirements as discussed by the majority, I would also require the jury to be instructed that it should consider the defendant's conduct in light of the type of assembly and irrespective of the content of the defendant's message. Therefore I respectfully dissent to part II A 2 of the majority's opinion. However, because I agree with the majority's application of the *Kay* standards when reviewing for the sufficiency of the evidence in this case, I concur in its judgment.