The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 23, 2020

## 2020COA110

**No. 17CA1122, *Peo in Interest of KDW* — Constitutional Law —
Fourth Amendment — Searches and Seizures — Investigatory
Stops — Grounds for Stop or Investigation — Reasonable
Suspicion**

A division of the court of appeals considers whether the

district court erroneously denied K.D.W.'s motion to suppress.  The

district court denied the motion to suppress on the grounds that an

investigatory stop was supported by reasonable suspicion and a

search of K.D.W.'s backpack was a search incident to lawful arrest.

However, the division concludes that the investigatory stop was not

supported by reasonable suspicion and, therefore, the evidence

found in the backpack that was seized in the course of the

investigatory stop should have been suppressed.  Accordingly, the

division reverses K.D.W.'s adjudications for possession of a

handgun by a juvenile, attempt to carry a concealed weapon, and possession of marijuana, and remands for further proceedings.

The division also considers whether K.D.W.'s actions in the course of the illegal stop — namely, trespass and obstruction of peace officers— rendered the search of his pockets sufficiently attenuated from the police misconduct.  The division concludes that the attenuation exception to the exclusionary rule applies. Therefore, the division concludes that the motion to suppress was properly denied as to the search of K.D.W.'s pockets and the statements he made to the officer after his arrest, and affirms K.D.W.'s adjudications for obstruction and trespass.

OKCOLORADO COURT OF APPEALS                                    **2020COA110**

Court of Appeals No. 17CA1122
Arapahoe County District Court No. 16JD174
Honorable Ben L. Leutwyler, Judge
Honorable Christina Apostoli, Magistrate

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of K.D.W.,

Juvenile-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE ROMÁN
Tow and Pawar, JJ., concur

Announced July 23, 2020

Philip J. Weiser, Attorney General, Gabriel Olivares, Assistant Attorney
General, Denver, Colorado, for Petitioner-Appellee

Megan A. Ring, Colorado State Public Defender, Ryann S. Hardman, Deputy
State Public Defender, Denver, Colorado, for Juvenile-Appellant

¶ 1    K.D.W., a juvenile, appeals the district court's affirmance of his adjudication of delinquency. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.    Background

¶ 2    Police officers in an unmarked vehicle were investigating a series of recent residential burglaries when they observed a black male speaking with the driver of a large, green van in a park. The officers followed the van as it drove away and observed a white vehicle following the van. The white vehicle later evaded police when they attempted to conduct a traffic stop.

¶ 3    The officers returned to the area and saw K.D.W., whom they believed to be the male they saw speaking with the driver of the green van. K.D.W. was observed with a backpack and a trash bag. Nearby uniformed officers were instructed to contact K.D.W., who was sitting on a park bench.

¶ 4    As one officer approached K.D.W. in her patrol vehicle, he began to walk away. The officer got out of the vehicle and said, "[H]ey, I need to talk to you." K.D.W. stopped. The officer requested K.D.W. take his hand out of his pocket and put down his backpack and bag. K.D.W. complied. However, K.D.W. twice refused to allow

1

the officer to pat him down. By that time, another officer had arrived and was standing nearby.

¶ 5        Both officers attempted to grab K.D.W. but failed, and he fled the area. One officer pursued K.D.W. in her vehicle, and the other stayed behind with the bags. Several officers and a detective responded to a call for assistance in stopping K.D.W., who climbed over a fence and ran through a residential backyard. A detective observed K.D.W. in an alley, crouched down and appearing to change his shirt. Officers eventually stopped him in the front yard of another property. Once K.D.W. was detained, officers radioed that they "had found ammunition on his person," so other officers in the area began canvassing for a firearm, as they were "worried that maybe a gun had been dropped . . .or thrown away in the area." The officer who initially pursued K.D.W. took him into custody.

¶ 6        Once the officer that stayed near the park received word that K.D.W. was detained, he opened the backpack K.D.W. had left behind. It contained a box of .22 caliber ammunition, a Ruger .22 semi-automatic pistol, a green baggie and a white plastic container

that the officer believed contained marijuana, and loose marijuana at the bottom of the bag.

¶ 7     K.D.W. was taken to the local jail, where he made incriminating statements about the incident to an officer relating to his possession of a handgun.

¶ 8     The People filed a delinquency petition charging K.D.W. with (1) possession of a handgun by a juvenile; (2) obstructing a peace officer; (3) attempt to carry a concealed weapon; (4) second degree trespass; and (5) possession of marijuana by an underage person.

¶ 9     After a bench trial, a magistrate adjudicated K.D.W. a delinquent on all counts and sentenced him to one year of probation.  K.D.W. sought district court review of the magistrate's determinations.  The district court denied his petition in a written order and adopted the magistrate's adjudication order.

## II.     Analysis

¶ 10     On appeal, K.D.W. contends that (A) the district court erred when it denied his motions to suppress because the police did not have reasonable suspicion to conduct an investigatory stop and (B) the evidence is insufficient to support his adjudication for obstructing a peace officer.

## A. Motions to Suppress

¶ 11    K.D.W. contends that the district court erred by denying his motions to suppress because the officers did not have the requisite reasonable suspicion "that criminal activity has occurred, is taking place, or is about to take place" when they stopped K.D.W. *People v. Revoal*, 2012 CO 8, ¶ 10 (quoting *People v. Padgett*, 932 P.2d 810, 814-15 (Colo. 1997)).  We agree.  We further conclude that, while the attenuation exception to the exclusionary rule applies to the search of K.D.W.'s pockets and the statements he made to officers after his arrest, it does not apply to the search of his backpack because the backpack was seized during the improper investigatory stop.  Therefore, we affirm K.D.W.'s adjudications for obstruction and trespass, reverse his adjudications for possession of a handgun by a juvenile, attempt to carry a concealed weapon, and possession of marijuana, and remand for further proceedings.

### 1. Standard of Review and Applicable Law

¶ 12    A magistrate's or district court's "ruling on a suppression motion presents a mixed question of fact and law." *People v. Tomaske*, 2019 CO 35, ¶ 7.  We defer to the district court's findings

4

of fact if they are supported by competent evidence in the record. *Id.* We review the district court's conclusions of law de novo. *Id.*

¶ 13     Under the Fourth Amendment to the United States Constitution, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

¶ 14     "There are three categories of encounters between police and citizens: (1) arrests; (2) investigatory stops; and (3) consensual interviews." *People v. Scheffer*, 224 P.3d 279, 284 (Colo. App. 2009). Only arrests and investigatory stops implicate the search and seizure protections of the Fourth Amendment and article II, section 7 of the Colorado Constitution. *Id.* As relevant here, "[a]n investigatory stop is an encounter in which an officer briefly stops a suspicious person and makes reasonable inquiries to confirm or dispel these suspicions, such as determining an individual's identity or obtaining an explanation of a person's behavior." *People v. Funez-Paiagua*, 2012 CO 37, ¶ 7. The parties do not challenge the district court's finding that K.D.W. was "seized" and that the encounter here constituted an investigatory stop.

5

¶ 15     For an investigatory stop to be constitutionally valid, (1) the officer must have a reasonable suspicion that criminal activity has occurred, is taking place, or is about to take place; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose. *Revoal*, ¶ 10. At issue in this case is whether the officer had reasonable suspicion to make an investigatory stop.

¶ 16     To determine whether an officer had reasonable suspicion to make an investigatory stop, we must consider the facts and circumstances known to the officer at the time of the intrusion. *Id.* at ¶ 11. This may include the officer's own observations as well as information supplied by a fellow officer. *People v. Threlkel*, 2019 CO 18, ¶ 21. To justify an investigatory stop, an officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Revoal*, ¶ 11 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Whether reasonable suspicion exists is based on an objective (not subjective) standard and depends on the totality of the circumstances. *People v. Reyes-Valenzuela*, 2017 CO 31, ¶ 12.

¶ 17    Evidence of a crime that is derived from evidence discovered through illegal police activity may be suppressed under the fruit-of-the-poisonous-tree doctrine. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963); *Perez v. People*, 231 P.3d 957, 962 (Colo. 2010). Absent narrow exceptions not applicable here, if evidence was obtained as a direct result of an illegal search or seizure, it must be suppressed. *See People v. Rodriguez*, 945 P.2d 1351, 1363 (Colo. 1997). Whether evidence was obtained as a direct result of an illegal search or seizure depends on whether the evidence was obtained by exploiting the illegality or instead by "means sufficiently distinguishable to be purged of the primary taint" of the illegality. *Id.* at 1363-64 (quoting *Wong Sun*, 371 U.S. at 488).

¶ 18    "If a trial court erroneously admits evidence in violation of the Fourth Amendment and the exclusionary rule, we must reverse unless the error was harmless beyond a reasonable doubt." *People v. Dyer*, 2019 COA 161, ¶ 17. This standard requires the People to prove the error does not require reversal. *Id.*

## 2.    Additional Facts

¶ 19    Before trial, K.D.W. filed a "Motion to Suppress Evidence, Observations and Statements Stemming from the Illegal and

7

Unsupported Search of [K.D.W.]'s Pockets and Backpack" and a "Motion to Suppress Evidence, Observations, and Statements from the Unsupported and Illegal Arrest of [K.D.W.]."

¶ 20    At the motions hearing, the police officers and detectives involved with the investigation, attempted stop, and pursuit of K.D.W. testified.  As relevant here, the court issued the following findings of fact:

- Officers were investigating a recent string of local, residential, daytime burglaries.

- The morning of the events at issue, officers saw a black male talking to the driver of a green van at a park known known for "gangs, assaults, drug activity, and weapons."

- Officers observed the van pull out of the parking lot, and, as they were following the van, they noticed a white car that also appeared to be following the van.

- The white car then eluded police after an attempted traffic stop.

- Because the officers were concerned about potential connections between the vehicles and what they saw at the park, they returned to the park.

- Officers saw K.D.W. at the park and believed he was the same male that they had seen speaking with the driver of the van based on his clothing.

- Although there was a discrepancy in the specific descriptions of the clothing, the descriptions in general were similar.

- The officers observed K.D.W. wearing a backpack and holding a trash bag.

- The officers observed that K.D.W. appeared to be school-age, and it was the morning of a weekday while school was in session.

- As the patrol vehicle approached K.D.W., officers saw him look at the vehicle and walk away.

- As the officer approached him, she said, "[H]ey, I need to talk to you."

- When the officer stopped him, he reached toward his pocket.

- The officer asked him to take his hand out of his pocket and put down his backpack.

- When the officer asked if she could pat him down for safety, K.D.W. refused twice.

- K.D.W. then fled the area, leaving his backpack and bag behind.

- Officers observed K.D.W. trespassing through private residential property as he fled.

The court found, under the totality of the circumstances, that the officers had reasonable suspicion to conduct a proper investigatory stop and, therefore, denied K.D.W.'s motions.

### 3.    Reasonable Suspicion

¶ 21    The district court acknowledged that this is a "very close call" as to whether the officers had reasonable suspicion that criminal activity had occurred or was taking place. We agree that this issue is close, but we disagree with the district court's legal conclusion.

¶ 22    In our view, the officer conducting the investigatory stop did not have reasonable suspicion sufficient to justify seizing K.D.W. A comparison of two Colorado Supreme Court cases informs our analysis.

¶ 23    In *Revoal*, the supreme court concluded that reasonable suspicion did not exist where the facts known to the investigating officer prior to the intrusion were:

> (1) it was 11:30 p.m.; (2) robberies had recently occurred in the area; (3) [the defendant] was standing on the side of a closed Subway, looking left to right; (4) [the defendant] walked to the side of an open liquor store, continued looking left to right, then walked toward the back of the liquor store, where it was dark; and (5) [the defendant] turned and walked away from [the investigating officer] when he observed the patrol vehicle.

*Revoal*, ¶¶ 12-20.

¶ 24    On the other hand, in *Funez-Paiagua*, the court concluded that reasonable suspicion did exist where the facts known to the investigating officer prior to the stop were:

> (1) it was 1:15 a.m.; (2) criminal activity had recently increased in the area; (3) [the defendant] was standing on the private property of an auto body shop; (4) the shop was closed; (5) no other businesses in the area were open; (6) no other people were nearby; (7) the officer heard a loud crash; (8) [the defendant] fled; and (9) [the defendant] was carrying bags.

*Funez-Paiagua*, ¶¶ 10-14.

11

¶ 25     In this case, the only facts and circumstances known to the officer as she approached K.D.W. were: (1) it was the morning of a school day, and K.D.W. appeared school-age; (2) the police were investigating a recent string of local, daytime burglaries (though none had occurred that day); (3) K.D.W. was carrying a backpack and garbage bag; (4) K.D.W. somewhat matched a description of a black male with black and white clothing who had been speaking to the occupant of a van the officers deemed suspicious;[1] and (5) K.D.W. and the van were in a park known for gangs, drugs, assault, and weapons.

¶ 26     Analyzing these factual findings, we agree with K.D.W. that the fact that there had previously been criminal activity in the area and his action of walking away from police officers were not, by themselves or in combination, sufficient to create reasonable suspicion. *Revoal*, ¶ 18; *Outlaw v. People*, 17 P.3d 150, 157 (Colo. 2001). We recognize that a high-crime area can "provide one element of support for an investigatory stop." *People v. Archuleta,*

---

[1] Notably, at the hearing on the motions to suppress, the officers described the individual at the van to be wearing "darker pants" or "black pants," while K.D.W.'s pants were described as "black and white" by one officer and "white" by another officer.

980 P.2d 509, 515 (Colo. 1999). Indeed, "[f]actors which are not by themselves proof of illegal conduct may give a police officer reasonable suspicion." *People v. Rahming*, 795 P.2d 1338, 1341 (Colo. 1990); *see also People v. Pacheco,* 182 P.3d 1180 (Colo. 2008) (determining investigatory stop was proper where the officer suspected burglary because it was late, the location of the vehicle behind a business was suspicious, the business was closed, and the vehicle's lights were off). But the mere description of an area as "high-crime" does not create reasonable suspicion of every young person of color in that neighborhood. *See United States v. Montero-Camargo,* 208 F.3d 1122, 1138 (9th Cir. 2000) ("The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity."); *see also United States v. Clay,* 640 F.2d 157, 159 (8th Cir. 1981) ("Police cannot have grounds for suspicion based solely on the race of the suspect.").

¶ 27 Moreover, unlike the defendant in *Funez-Paiagua*, who was present on business property, after hours, where the police heard a loud crash, K.D.W. was not observed on private property or

13

associated with a burglary in progress — he was sitting in a public park with a bag and a backpack, and the officers were not aware of any crime having just occurred. While the officers testified about a possible connection between the white car that evaded police and the occupant of the van the officers believed K.D.W. spoke to, there was no testimony that the white car was linked to K.D.W., that the white car was idling in the park K.D.W. was sitting in, or that the white car and K.D.W. were linked to any criminal activity. In other words, the officers did not articulate more than an inchoate hunch that K.D.W. was involved in recent or ongoing criminal activity. *See Revoal*, ¶ 11 ("The officer's 'unarticulated hunch' that a criminal act has occurred is not sufficient." (quoting *People v. Greer*, 860 P.2d 528, 530 (Colo. 1993))).

¶ 28    Under these circumstances, we conclude that reasonable suspicion to justify seizing K.D.W. did not exist. But, because of K.D.W.'s subsequent actions, our analysis does not end there.

### 4.    Attenuation

¶ 29    We agree with the People that the search of K.D.W.'s pockets was attenuated from the illegal seizure because K.D.W.'s independent and willful criminal actions of trespass and

14

obstructing a peace officer broke the causal chain between the police officers' misconduct and their discovery of the evidence of K.D.W.'s criminal conduct. The backpack, on the other hand, was seized during the course of the illegal investigatory stop before K.D.W. fled. Therefore, the seizure and search of the backpack was a fruit of the improper investigatory stop, and its contents must be suppressed.

¶ 30    "The attenuation doctrine applies in situations where 'the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance.'" *Tomaske*, ¶ 12 (quoting *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2061 (2016)).

> When defendants have responded to Fourth Amendment violations with willful criminal acts against police officers, courts have applied the attenuation doctrine and held that evidence of the criminal act is admissible. "[A]n independent and willful criminal act against a law enforcement officer" is sufficient to break the causal chain between the police misconduct and the evidence of the new crime, such that the attenuation doctrine applies. This is so for two reasons: (1) admission of the contested evidence does not incentivize illegal searches by the police; and (2) a contrary approach would "effectively give the victim of

15

> police misconduct carte blanche to respond
> with any means, however violent."

*Id.* at ¶ 13 (citations omitted).

¶ 31    In *Tomaske*, police entered the defendant's property and chased him into his house in violation of the Fourth Amendment. *Id.* at ¶ 1. The defendant "responded by resisting and allegedly assaulting a police officer." *Id.* The court concluded that the exclusionary rule did not apply because the defendant's "decision to resist 'br[oke] the causal connection between the police illegality and the evidence of the new crime.'" *Id.* at ¶ 17 (quoting *People v. Doke*, 171 P.3d 237, 240 (Colo. 2007)).

¶ 32    Here, the district court found that K.D.W. trespassed and obstructed a peace officer after he fled from police. The record supports these findings. Thus, K.D.W.'s trespass and obstruction gave police probable cause to arrest him. This in turn broke the causal chain between the unlawful investigatory stop and the later arrest, the search of K.D.W.'s pockets, and the statements he made to officers after his arrest. Accordingly, the district court properly denied K.D.W.'s motion to suppress as to the search of K.D.W.'s pockets and the statements he made to officers while he was in

16

custody. *Moody v. People*, 159 P.3d 611, 615 (Colo. 2007)

("[A]ppellate courts have the discretion to affirm decisions,

particularly denial of suppression motions, on any basis for which

there is a record sufficient to permit conclusions of law, even

though they may be on grounds other than those relied upon by the

trial court.").

¶ 33    However, attenuation cannot justify the officers' seizure and

later search of K.D.W.'s backpack. Contrary to the People's

argument, K.D.W. did not abandon the backpack when he fled. The

officers ordered K.D.W. to place the backpack on the ground during

the illegal stop and maintained control over it when K.D.W. fled,

effectively seizing it. Thus, K.D.W.'s subsequent trespass and

obstruction did not break any "causal connection between the

police illegality and the evidence of the new crime." *Tomaske*,

¶¶ 17-18 (quoting *Doke*, 171 P.3d at 240) ("[U]nlike the scenario

where police officers' misconduct leads to their *discovery* of evidence

of a *completed* crime (e.g., finding contraband), this case involves

police misconduct that led to the *commission* of a *new* crime. The

exclusionary rule applies to the former situation, not the latter.").

17

¶ 34    Accordingly, the evidence obtained as a result of the illegal seizure and later search of the backpack must be suppressed.  *See People v. Martinez,* 200 P.3d 1053, 1054 (Colo. 2009) (affirming trial court's grant of a motion to suppress evidence where investigatory stop was not supported by reasonable suspicion).

¶ 35    Further, because the People failed to present any argument that the admission of the evidence in K.D.W.'s backpack — the handgun and marijuana — was harmless beyond a reasonable doubt, we are required to reverse K.D.W.'s adjudication for possession of a handgun by a juvenile, attempt to carry a concealed weapon, and possession of marijuana, and remand for further proceedings.  *See Dyer,* ¶ 43; *see also Hagos v. People,* 2012 CO 63, ¶ 11 (preserved constitutional errors require reversal unless they are harmless beyond a reasonable doubt).

## B.    Sufficiency of the Evidence

¶ 36    Finally, K.D.W. argues that the magistrate erred in denying his motion for judgment of acquittal on the obstruction charge, alleging there was insufficient evidence to support his adjudication for obstructing a peace officer.  We disagree.

18

### 1. Standard of Review and Applicable Law

¶ 37    We review sufficiency of the evidence de novo regardless of whether the issue was preserved.  *McCoy v. People*, 2019 CO 44, ¶ 70; *People in Interest of J.R.*, 216 P.3d 1220, 1221 (Colo. App. 2009) ("When reviewing the sufficiency of the evidence supporting an adjudication of juvenile delinquency, the standards are the same as those used in a criminal case.").

¶ 38    In doing so, we must determine whether any rational trier of fact could accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt.  *People v. Sprouse*, 983 P.2d 771, 777 (Colo. 1999).  We give the prosecution the benefit of every reasonable inference to be drawn from the evidence, both direct and circumstantial.  *People v. Vecellio*, 2012 COA 40, ¶ 12; *see People v. Johnson*, 2015 COA 54, ¶ 32.  And we may not set aside a verdict merely because we might have drawn a different conclusion had we been the trier of fact.  *People v. Arzabala*, 2012 COA 99, ¶ 13.  Nor may we assess the credibility of witnesses or resolve conflicts, inconsistencies, or disputes in the evidence.  *See id.*

19

¶ 39   In determining whether sufficient evidence exists to support a

conviction for obstructing a peace officer, we look at the totality of

the circumstances.  *Dempsey v. People*, 117 P.3d 800, 812 (Colo.

2005).

¶ 40   A person commits the crime of obstructing a police officer

when, "by using or threatening to use violence, force, physical

interference, or an obstacle, such person knowingly obstructs,

impairs, or hinders the enforcement of the penal law or the

preservation of the peace by a peace officer, acting under the color

of his or her official authority." § 18-8-104(1)(a), C.R.S. 2019.  The

threat or use of an obstacle or physical interference "requires

conduct of sufficient magnitude to 'obstruct, impair or hinder'" a

police officer.  *Dempsey*, 117 P.3d at 810.

¶ 41   Because the obstruction statute punishes threats, as well as

use, of physical interference and obstacles, neither "physical

contact" nor actual physical interference is necessarily required to

commit the crime.  *Id.* at 811.  Thus, although mere verbal

opposition to an officer may not suffice, a combination of

statements and acts by the defendant can form the crime of

obstruction.  *Id.*

## 2.   Discussion

¶ 42    In *Dempsey,* the Colorado Supreme Court explained that an act clearly indicating an intent by the accused to prevent the officer from performing his or her duty amounts to obstruction.  117 P.3d at 811-12.  The court went on to hold that the evidence in that case was sufficient to support a conviction for obstruction of a police officer where the defendant was contacted by police, refused to provide identification, walked away from officers, and reached into his pocket in a manner that appeared threatening to the officers. *Id.*

¶ 43    In this case, the officers testified that K.D.W. led them on a four-block chase, jumped over a fence, committed trespass, and crouched in an alley and appeared to attempt to change his shirt. Based on this evidence, we conclude that the totality of the circumstances supports the conclusion that K.D.W.'s conduct was "of sufficient magnitude to 'obstruct, impair, or hinder'" the police. *Id.* at 810.

¶ 44    K.D.W. argues that the fact that he "simply ran away" is insufficient evidence to support his conviction, citing to footnote fourteen in *Dempsey.*  While that footnote notes that "such minor

21

acts as running from a policeman or trying to shake free of his grasp" may not be conduct sufficient to constitute obstruction, K.D.W.'s conduct was not limited to running away from the police. *Id.* at 811 n.14. Rather, in addition to fleeing, K.D.W. placed a physical obstacle between himself and the officers when he jumped over a fence onto private property. We therefore do not consider whether flight, alone, is sufficient to constitute the crime of obstructing a peace officer.

¶ 45 We also reject K.D.W.'s assertion that the officers were not "enforcing the penal law" or acting "under color of official authority" pursuant to section 18-8-104(1)(a) because they lacked reasonable suspicion to stop K.D.W. We acknowledge that *Dempsey* required the investigatory stop in that case to be lawful pursuant to section 16-3-103(1), C.R.S. 2004. *Dempsey*, 117 P.3d at 812 ("Thus, the officer's command must be attached to performance of an official function such as an investigatory stop that is justified by articulable basis in fact."). However, the General Assembly has since modified the obstruction statute to read,

> It is not a defense to a prosecution under this section that the peace officer was acting in an illegal manner, if he or she was acting under

22

color of his or her official authority. A peace officer acts 'under color of his or her official authority' if, in the regular course of assigned duties, he or she makes a judgment in good faith based on surrounding facts and circumstances that he or she must act to enforce the law or preserve the peace.

§ 18-8-104(2); *see* Ch. 268, sec. 15, § 18-8-104(2), 2012 Colo. Sess. Laws 1398. "[A] law enforcement officer is 'engaged in the performance of his duties' while making in good faith an arrest or stop which may be later adjudged to be invalid, unless he is on a personal frolic or resorts to unreasonable or excessive force." *People v. Johnson*, 677 P.2d 424, 425 (Colo. App. 1983). We discern nothing from the record to indicate the officers involved acted in bad faith, were on a "personal frolic," or resorted to "unreasonable or excessive force."

¶ 46 Because there was sufficient evidence to support K.D.W.'s adjudication on the obstruction charge, the magistrate did not err in denying the judgment of acquittal on the obstruction charge.

III. Conclusion

¶ 47 The judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

JUDGE TOW and JUDGE PAWAR concur.