The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 13, 2025

## 2025COA16

**No. 23CA0059, *People in Interest of L.E.R-N.* — Children's Code — Delinquency — Investigations and Law Enforcement — Custodial Interrogations — Statements or Admissions — Presence of Parent, Guardian, or Legal or Physical Custodian**

A division of the court of appeals holds that section 19-2.5-203(1), C.R.S. 2024, which requires a parent to be present during the custodial interrogation of a juvenile, does not include a parental attentiveness requirement.  The division therefore rejects the juvenile's argument that his mother's physical presence at the interrogation did not satisfy the statute because she was on the phone and not fully attentive to the interrogation.  Because there is no dispute that the juvenile's mother was physically present during the interrogation, the juvenile's statements were admissible.

Court of Appeals No. 23CA0059
Adams County District Court No. 22JD124
Honorable Katherine R. Delgado, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of L.E.R-N.,

Juvenile-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE SCHOCK
Freyre and Sullivan, JJ., concur

Announced February 13, 2025

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney General, Denver, Colorado, for Petitioner-Appellee

Amy D. Trenary, Alternate Defense Counsel, Broomfield, Colorado, for Juvenile-Appellant

¶ 1     Section 19-2.5-203(1), C.R.S. 2024, bars the admission into evidence of any statement made by a juvenile as a result of custodial interrogation unless the juvenile's parent was present at the interrogation.[1]  In this case, the juvenile, L.E.R-N., contends that his mother's physical presence during his interrogation did not satisfy this statute because she took a phone call as the questioning began and thus was not fully attentive to the interrogation.

¶ 2     We reject this argument and conclude that section 19-2.5-203(1) does not include a parental attentiveness requirement. Because there is no dispute that L.E.R-N.'s mother was physically present during the interrogation, L.E.R-N.'s statements were properly admitted.  We also conclude that the evidence was sufficient to support L.E.R-N.'s adjudications of delinquency for possession of a handgun by a juvenile and possession of a large-capacity magazine.  We therefore affirm the judgment.

---

[1] The statute allows for the presence of "a parent, guardian, or legal or physical custodian of the juvenile."  § 19-2.5-203(1), C.R.S. 2024. For ease of reference, and because this case involves a parent, we refer to this requirement as "parental presence" and to the required parent, guardian, or custodian as the "parent."

## I. Background

¶ 3 After following a stolen car into the parking lot of an apartment complex, police officers saw L.E.R-N. load a television into the back seat of the car. Upon seeing the officers, L.E.R-N. attempted to flee into the apartment complex. Another man, Edgar Perez, was sitting in the front passenger seat of the car at the time.

¶ 4 The officers spoke with Perez, who told them that L.E.R-N. had driven the car to the apartment complex. They searched the car and found a handgun with a large-capacity magazine on the front passenger side floorboard. Perez told officers that L.E.R-N. had handed him the gun when they got to the apartment complex.

¶ 5 Meanwhile, other officers found L.E.R-N. and brought him back to the scene. L.E.R-N.'s mother also arrived and spoke with an officer about what had occurred. As L.E.R-N. was handcuffed in the backseat of a police car, the officer asked his mother if she wanted them to question him, explaining that any statements he made could be used against him in court. After L.E.R-N. said he wanted to talk to the officers, his mother agreed. The officer read L.E.R-N. and his mother an advisement of their rights, and both

2

signed a form acknowledging those rights. L.E.R-N.'s mother gave the officers permission to interview L.E.R-N. in her presence.

¶ 6     While the officer was reading the juvenile advisement form, L.E.R-N.'s mother attempted to make several phone calls to get advice about what L.E.R-N. should do. Just as the officer began questioning L.E.R-N., she received a call from L.E.R-N.'s caseworker and took the call, still standing next to L.E.R-N. and the officer. The officer asked L.E.R-N. how he got the car, and L.E.R-N. said he bought it for sixty dollars from another kid. The officer then asked when he bought it, and L.E.R-N. responded, "Like two days ago."

¶ 7     At that point, L.E.R-N.'s mother interrupted and told L.E.R-N. to "remain silent actually." The officer stopped the interview and waited for L.E.R-N.'s mother to finish her phone call. When she finished the call, she told L.E.R-N., "We're not talking to him." The officer ended the interview and did not ask any more questions.

¶ 8     L.E.R-N. was charged in a petition in delinquency with second degree aggravated motor vehicle theft, possession of a handgun by a juvenile, and possession of a large-capacity magazine.

¶ 9     Before trial, he moved to suppress the statements he made in response to the officer's questions, asserting that his mother was

not "present" during the interrogation, as required by section 19-2.5-203(1), because she was on the phone.  The prosecution argued that L.E.R-N.'s mother was present because she was "physically there," even if she "chose to tune out" the interview.

¶ 10    The juvenile court agreed with the prosecution and denied the motion to suppress, reasoning as follows:

> [I]t is clear that the juvenile advisement of his rights was completed both orally and in writing by the juvenile and by his parent.  The mother was present and why she chose to take a phone call as the interrogation had just begun, I don't know, that was probably not the smartest thing to do.  But she was present during the questioning.  Did not stop the questioning until after she completed the phone call.

¶ 11    After a trial, the juvenile court adjudicated L.E.R-N. delinquent on all three counts.

## II.    Parental Presence During Custodial Interrogation

¶ 12    L.E.R-N. contends that the juvenile court erred by denying his motion to suppress because his mother was not "present" when the officer asked him the two questions about how he got the car.  He does not dispute that his mother was *physically* present at the time of those questions.  But he contends that she was not fully

4

"present" because she was distracted by the phone call and, therefore, unable to attend to the questions being asked. We are not persuaded. Under the facts of this case, we agree with the juvenile court that the parental presence requirement was satisfied.

## A. Standard of Review

¶ 13    We review the juvenile court's suppression ruling as a mixed question of fact and law. *Leyba v. People*, 2021 CO 54, ¶ 11. We defer to the juvenile court's factual findings if those findings have record support, and we review the legal effect of the facts de novo. *Id.* When, as in this case, the statements were video-recorded and there are no disputed facts outside the recording, we are in a similar position to the juvenile court to determine whether the statements should be suppressed. *Id.* In such a scenario, we may independently review the video recording to determine whether the statements were properly admitted in light of controlling law. *Id.*

¶ 14    We review issues of statutory interpretation de novo. *McCoy v. People*, 2019 CO 44, ¶ 37. In interpreting a statute, we aim to "ascertain and give effect to the legislature's intent." *Id.* We begin with the "language of the statute, giving its words and phrases their plain and ordinary meanings." *Id.* But we do not read words or

phrases in isolation. *Lewis v. Taylor*, 2016 CO 48, ¶ 20. Instead, we read them in context based on rules of grammar and common usage. *McCoy*, ¶ 37. We also "endeavor to effectuate the purpose of the legislative scheme" by "read[ing] that scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts" and "avoid[ing] constructions that would render any words or phrases superfluous or lead to illogical or absurd results." *Id.* at ¶ 38.

### B. Parental Presence Requirement

¶ 15 Section 19-2.5-203(1) requires a parent to be present during the custodial interrogation of a juvenile. It provides as follows:

> A statement or admission of a juvenile made as a result of the custodial interrogation of the juvenile by a law enforcement official concerning delinquent acts alleged to have been committed by the juvenile are not admissible in evidence against the juvenile unless a parent . . . of the juvenile was present at such interrogation . . . .

*Id.*[2] The purpose of this requirement is to provide an "additional and necessary assurance that the juvenile's Fifth Amendment right

---

[2] Section 19-2.5-203(1) also requires that the juvenile's parent be advised of certain of the juvenile's rights, including the right to remain silent and the right to counsel. That requirement is not at issue in this case, and we express no opinion as to what qualifies as an adequate advisement for purposes of the statute.

6

against self-incrimination . . . will be fully afforded to him." *People in Interest of A.L.-C.*, 2016 CO 71, ¶ 12 (citation omitted).[3]

¶ 16    But the statute "merely requires that a parent be present." *Id.* at ¶ 11. It does not require the parent to share the juvenile's interests or "h[o]ld the juvenile's interests 'uppermost in mind.'" *Id.* at ¶ 13. Nor does it require effective assistance from the parent. *Id.* at ¶ 14. So long as the parent "accompanie[s]" the juvenile during the interrogation, the statutory requirement is satisfied. *Id.* at ¶ 11.

### C.    Meaning of Presence

¶ 17    The admissibility of L.E.R-N.'s statements turns on the meaning of the word "present." The People contend that it means only that the parent *physically* accompany the juvenile — in other words, that the parent is *physically* present during the interrogation. L.E.R-N. argues that it requires a degree of attentiveness — or *mental* presence — that was lacking in this case.

---

[3] Section 19-2.5-203(1) was previously codified at section 19-2-511(1), C.R.S. 2016, and *People in Interest of A.L.-C.*, 2016 CO 71, applied that predecessor statute. But the relevant language has not changed. *See* Ch. 136, sec. 2, § 19-2.5-203, 2021 Colo. Sess. Laws 567-69; *Nicholas v. People*, 973 P.2d 1213, 1218 & n.8 (Colo. 1999) (citing prior versions of statute dating back to 1967), *superseded by statute*, Ch. 332, sec. 10, § 19-2-511(2), 1999 Colo. Sess. Laws 1374-75, *as recognized in People v. J.D.*, 989 P.2d 762 (Colo. 1999).

Although we need not in this case define the outer boundaries of what qualifies as physical presence, we fundamentally agree with the People's interpretation under the facts of this case.

¶ 18      To start, the plain and ordinary meaning of the word "present" generally connotes a physical component. As L.E.R-N. recognizes, one prevailing definition of the word is "being in one place and not elsewhere" or "being in view or at hand." Webster's Third New International Dictionary 1793 (2002); *see also Miller v. Amos*, 2024 CO 11, ¶ 23 ("In determining the usual and ordinary meaning, we may look to a dictionary for assistance."). "Presence" is similarly defined as "[t]he quality, state, or condition of being in a particular time and place, particularly with reference to some act that was done then and there." Black's Law Dictionary 1432 (12th ed. 2024). Thus, as a division of this court has held in another context, "the plain, commonsense meaning of 'presence' requires physical location in the same place as the referring person or thing." *Barnes v. Dep't of Revenue*, 23 P.3d 1235, 1236 (Colo. App. 2000).

¶ 19      That interpretation comports with the supreme court's interpretation of the statute in *A.L.-C.* Although *A.L.-C.* did not directly address the definition of "present," it concluded that the

parental presence requirement was satisfied because the juvenile's mother "accompanied him throughout the interview process" — even if the mother was incapable of protecting the juvenile's rights due to a conflict of interest. *A.L.-C.*, ¶¶ 1, 11. In doing so, the court expressly rejected an "effective-assistance-of-parent" standard that would take into account whether the parent was able to provide the assistance the statute was designed to ensure, noting that the legislature had chosen to require only that a parent be present to "stand 'on the side' of the juvenile." *Id.* at ¶ 14 (citation omitted).

¶ 20     This physical conception of presence is also consistent with the context and structure of the statute as a whole. The statute requires a parent to be present *at* the interrogation — a preposition that itself connotes a particular time and place. *See* § 19-2.5-203(1). And another subsection alternatively allows the juvenile to be "accompanied by a responsible adult who was a custodian of the juvenile or assuming the role of a parent at the time." § 19-2.5-203(3). Harking back to the language used in *A.L.-C.*, this subsection effectively equates a responsible adult *accompanying* the juvenile to a parent being *present* — further suggesting that the legislature intended to require only *physical* presence. *See People v.*

*Dist. Ct.*, 713 P.2d 918, 921 (Colo. 1986) ("If separate clauses within a statute may be reconciled by one construction but would conflict under a different interpretation, the construction which results in harmony rather than inconsistency should be adopted.").

¶ 21     L.E.R-N. relies on several alternative definitions of the word "present" to argue that the term is ambiguous.  And it is true that "present" can also mean "attentive" or "having one's mind or thoughts directed toward a matter at hand."[4]  Webster's Third New International Dictionary 1793 (2002).  But "[t]he fact that an undefined word in a statute has more than one dictionary definition does not necessarily render either the word or the statute ambiguous."  *Ybarra v. Greenberg & Sada, P.C.*, 2016 COA 116, ¶ 16, *aff'd*, 2018 CO 81.  In light of *A.L.-C.* and the statute as a whole, the word "present" is not "reasonably susceptible" *in this context* of the interpretation L.E.R-N. proposes.  *McCoy*, ¶ 38.  Such

---

[4] Webster's Third New International Dictionary characterizes this definition as obsolete.  L.E.R-N. cites a similar definition from another dictionary, but we have been unable to locate that definition in that dictionary, and it does not appear in the attachment to L.E.R-N.'s opening brief, as he asserts.  Nevertheless, we recognize that this is one possible meaning of "present."

an interpretation would be tantamount to the "effective-assistance-of-parent" standard that *A.L.-C.* rejected. *A.L.-C.*, ¶ 14.

¶ 22 Indeed, not only does such an interpretation find no support in the statute or the case law, but it would be unworkable. *See People v. Griffin*, 397 P.3d 1086, 1090 (Colo. App. 2011) (rejecting a statutory interpretation that "yields unworkable results"). It is one thing for an interrogating officer to ensure that a parent is physically present. It is quite another to ensure that a parent is paying sufficient attention. And what degree of attention would be sufficient? What about a parent who scrolls through their phone or sends a text message during the interrogation? What about one who is daydreaming or thinking about other things? How would a court — much less an officer in the moment — make that determination? The statute gives us no way to draw these lines.

¶ 23 This case illustrates that dilemma. L.E.R-N.'s mother was fully engaged with the officer and L.E.R-N. for all but seconds of their several-minute interaction, asking questions and seeking clarifications on the advisement. She consented to the interview and remained within feet of the officer, where she could hear him speaking to L.E.R-N. And even while on the phone, she remained

11

sufficiently engaged to stop the questioning after just two questions. Thus, L.E.R-N.'s mother was attentive to some degree, and her presence ultimately, if belatedly, served the statute's purpose. L.E.R-N. offers no standard — much less one grounded in the statute — for assessing whether his mother was attentive *enough*.

¶ 24     L.E.R-N. also asserts that the statutory purpose of protecting the juvenile would be better served by a requirement that the parent be attentive to the interrogation. And that may be true. But it is not the line the legislature drew. *See A.L.-C.*, ¶ 14. Instead, the legislature determined that a juvenile's rights are sufficiently protected by having a parent "present during the advisement and interrogation." *Id.*; *see also Grant v. People*, 48 P.3d 543, 549 (Colo. 2002) ("The crux of the statute . . . is that the juvenile have *access* to an adult who will help safeguard the child's constitutional

rights . . . .") (emphasis added).  We may not add a parental

attentiveness requirement through a "judicial gloss."  *A.L.-C.,* ¶ 14.[5]

### D.    L.E.R-N.'s Mother Was Present

¶ 25    L.E.R-N. does not dispute that his mother was physically

present when the officer asked L.E.R-N. the two questions at issue.

She was within a couple feet of the officer, in effectively the same

position she had been in during the reading of the advisement.  The

officer could hear her, and she could hear the officer speaking to

L.E.R-N., even as she was on the phone.  And she agreed that she

was "within the physical presence" of both the officer and L.E.R-N.

¶ 26    Moreover, although we have rejected an extra-statutory

attentiveness requirement, we reiterate that L.E.R-N.'s mother was

generally engaged in the interaction between the officer and her

son.  At most, thirty seconds passed between her taking the phone

---

[5] L.E.R-N. relies on cases that predate *A.L.-C.,* for the proposition
that a parent's physical presence does not suffice if the parent is
not in a position to provide effective guidance and advice to the
juvenile.  *See People v. White*, 64 P.3d 864, 873 (Colo. App. 2002);
*People in Interest of L.B.*, 513 P.2d 1069, 1070 (Colo. App. 1973).
To the extent those cases could apply on these facts, where
L.E.R-N.'s mother *did* provide guidance and advice, they are
inconsistent with *A.L.-C.  See A.L.-C.,* ¶¶ 15-20 (distinguishing
cases addressing whether the accompanying adult shared the
juvenile's interests and rejecting such a requirement for a parent).

call and her instruction to L.E.R-N. to "remain silent actually," thus demonstrating both her awareness that questioning was in progress and her ability to participate even as she was on the phone. In other words, this was not a situation in which the parent was physically present but otherwise unaware of what was happening.[6]

¶ 27 Thus, we conclude that L.E.R-N.'s mother was present at the custodial interrogation, even if her attention was briefly divided. The juvenile court correctly denied the motion to suppress.

### III. Sufficiency of the Evidence

¶ 28 L.E.R-N. also contends that the evidence was insufficient to support his adjudications for possession of a handgun and a large-capacity magazine. He asserts that (1) Perez's statements to police that L.E.R-N. handed him the gun were the only evidence at trial that L.E.R-N. possessed the handgun and magazine; and (2) those statements, introduced as prior inconsistent statements, were

---

[6] L.E.R-N. warns that if we construe the parental presence requirement to mean physical presence, the statute would be satisfied even when the parent is asleep or unconscious. We disagree. Those are not the facts of our case, and we express no opinion on how the statute would apply in that extreme scenario.

admissible only for impeachment. We disagree on both points and conclude the evidence was sufficient to support the adjudications.

## A. Additional Background

¶ 29 As noted above, the handgun and magazine were found on the front passenger side floorboard of the car, at the feet of L.E.R-N.'s adult codefendant, Perez. When the officers asked Perez about the gun, he said that L.E.R-N. had handed it to him when they got to the apartment complex and told him to "watch his 10."

¶ 30 Perez testified at trial. The prosecutor asked him if he remembered telling the police that L.E.R-N. had "handed [him] the gun when he parked and told [him] to watch the 10." Perez said he did not remember saying that. The prosecutor then asked Perez whether he recalled telling a different officer that L.E.R-N. handed him the gun. Perez again said he did not recall and elaborated:

> No. Honestly, all these questions are, like, just — this is something that I would say to somebody — it sounds like something I was saying. But, no. Honestly what happened was when they pulled up, the gun was, like, in the middle. And so when they had their guns drawn, I didn't want them to see — that to be the first thing they seen; so I threw it on the floor. So, like, whatever, all these questions are leading to, that's really, you know, what I have to say about the whole gun situation.

15

¶ 31   Perez further testified that the gun was not his, it was already in the car when he got in, no one else had been in the car with him and L.E.R-N., and he had "grabbed the gun out of the center console and placed it by [his] feet" when the officers approached.

¶ 32   After Perez's testimony, the two officers testified about Perez's prior statements — namely, that Perez had told them L.E.R-N. handed him the gun and told him to "watch his 10," or "basically be on the lookout." The second officer's testimony was admitted over L.E.R-N.'s counsel's objection as a prior inconsistent statement.

¶ 33   In addition to this testimony, the prosecution introduced as exhibits two of L.E.R-N.'s social media posts depicting L.E.R-N. pointing a handgun with a large-capacity magazine at the camera.

¶ 34   In adjudicating L.E.R-N. guilty of possessing the handgun and magazine, the juvenile court relied on the social media posts, Perez's testimony, and Perez's prior statements to the officers:

> The Court has considered the various exhibits admitted by the People in which the juvenile has posted several photographs of himself brandishing a weapon, including a weapon that looks like the weapon that was found on the passenger floorboard. It is uncertain and the People did not offer any evidence that it is, in fact, the gun. But it is obviously very similar by appearance.

16

When Mr. Perez was contacted by law enforcement, he was asked about the weapon. And although he didn't recall making those statements today, his statements to law enforcement were that the juvenile had handed him the gun. He did testify today that the gun was in the center console, and he moved it over to the floorboard as he was concerned, you know, that's what law enforcement would see when they approached the vehicle.

Based on the exhibits and based on the testimony, I find that the statements he gave to law enforcement on [the date of the offense] were credible and that it is a weapon, a gun that the juvenile was in possession of. It was in a car that he was driving.

And, again, I find the statements made to the officers by Mr. Perez on the date of the incident credible.

### B. Standard of Review

¶ 35    When a juvenile challenges the sufficiency of the evidence to support an adjudication,

> [w]e review the record de novo to determine whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient both in quantity and quality to support a conclusion by a reasonable mind that the [juvenile] is guilty of the charge beyond a reasonable doubt.

*People in Interest of B.D.*, 2020 CO 87, ¶ 8.

17

¶ 36     We do not assess the credibility of witnesses or resolve conflicts or inconsistencies in the evidence. *People in Interest of K.D.W.*, 2020 COA 110, ¶ 38. Nor may we set aside an adjudication "merely because we might have drawn a different conclusion had we been the trier of fact." *Id.* Instead, we ask only whether "any rational trier of fact could accept the evidence . . . as sufficient to support a finding of guilt beyond a reasonable doubt." *Id.*

¶ 37     L.E.R-N. argues that the evidence was insufficient to establish that he knowingly possessed the handgun and large-capacity magazine. *See* §§ 18-12-108.5, 18-12-302(1)(a), C.R.S. 2024. Possession means "actual or physical control." *People v. Allgier*, 2018 COA 122, ¶ 65 (citation omitted). This means that the juvenile must either physically possess the firearm or exercise immediate control over it. *See id.* at ¶ 63; *People v. Van Meter*, 2018 COA 13, ¶ 43 (holding that a jury instruction "framing 'possession' in terms of 'physical possession or control' . . . mirrors the generally accepted meaning of the term 'possession'"); *People v. Warren*, 55 P.3d 809, 816 (Colo. App. 2002) (approving a jury instruction defining possession as encompassing "the elements of immediate access to, and control and dominion over, an object"). The juvenile

18

must also be "aware of his physical possession or control [of the firearm] for a sufficient period to have been able to terminate it." § 18-1-501(9), C.R.S. 2024; *see also* § 18-1-502, C.R.S. 2024.

¶ 38    But possession does not require *exclusive* control. *Allgier,* ¶ 66. Nor does it require ownership. *Id.* at ¶¶ 67-68. Thus, a defendant may be found guilty of possessing a gun, even if the defendant does not have exclusive control over it. *Id.* at ¶ 66.

### C.    Perez's Prior Inconsistent Statements

¶ 39    The thrust of L.E.R-N.'s argument is that Perez's prior statements to the officers were admissible for impeachment purposes only and could not be considered as substantive evidence of his guilt under section 16-10-201, C.R.S. 2024. We disagree.

¶ 40    Section 16-10-201 provides that a witness's prior inconsistent statement is admissible "for the purpose of establishing a fact to which [the] testimony and the inconsistent statement relate," if two conditions are satisfied: (1) the witness, while testifying, was given an opportunity to explain or deny the statement or the witness is still available to give further testimony in the trial; and (2) the previous inconsistent statement purports to relate to a matter within the witness's own knowledge. This statute allows prior

19

inconsistent statements to be used as substantive evidence of the matter asserted, so long as the statutory foundation requirements are satisfied. *Montoya v. People*, 740 P.2d 992, 997-98 (Colo. 1987).

¶ 41 L.E.R-N. does not contest the second element of section 16-10-201 admissibility — that the prior inconsistent statements related to a matter within Perez's own knowledge. Nor does he dispute that Perez's trial testimony was inconsistent with those statements. And the People do not contend that Perez remained available to give further testimony (the second alternative to the first element). So the substantive use of Perez's statements to the police turns on whether Perez "was given an opportunity to explain or deny the statement[s]." § 16-10-201(1)(a). We conclude that he was.

¶ 42 After Perez testified that L.E.R-N. did not hand him anything when they arrived at the apartment complex — a statement plainly inconsistent with his statements to police — the prosecutor asked him if he remembered speaking with the officers. Perez said he did not. The prosecutor then asked him a series of specific questions mirroring the precise language of the statements, again asking if Perez recalled making those statements. Although Perez again said he did not, these questions gave him the *opportunity* to explain or

deny the statements. *See People v. Leverton*, 2017 COA 34, ¶ 30 (holding that witnesses had the opportunity to explain or deny statements when the prosecutor "confront[ed] them with the exact language of their prior statements" and the witnesses said they did not remember them). Section 16-10-201(1)(a) does not require that the witness in fact deny or explain the prior statement, only that they had the opportunity to do so. *See Montoya*, 740 P.2d at 998.

¶ 43 Moreover, Perez *did* attempt to explain the statements, acknowledging that it "sounds like something" he would say but "what happened was when they pulled up, the gun was . . . in the middle . . . so [he] threw it on the floor." And by testifying that he did not recall making the statements and offering a different account of what occurred, Perez effectively *did* deny the statements. *See Leverton*, ¶ 29 ("Under the statute, a witness's inability to remember a statement 'is tantamount to a denial that [the witness] made the statement.'" (quoting *People v. Baca*, 633 P.2d 528, 529

21

(Colo. App. 1981))); *Davis v. People*, 2013 CO 57, ¶ 7 n.2 ("A witness's actual or feigned memory loss is tantamount to denial.").[7]

¶ 44     Thus, because Perez had the "opportunity to explain or deny" his prior inconsistent statements, those statements were admissible "not only for the purpose of impeaching [Perez's] testimony . . . but also for the purpose of establishing" that L.E.R-N. handed him the gun. § 16-10-201(1). And the juvenile court found that Perez's statements to the officers on the date of the incident were credible.

### D.     Other Evidence

¶ 45     We also reject L.E.R-N.'s argument that Perez's prior inconsistent statements were the only evidence that L.E.R-N. possessed the gun and magazine.[8] In addition to those statements, the evidence at trial also included (1) the circumstantial evidence

---

[7] L.E.R-N. urges us not to follow *People v. Leverton*, 2017 COA 34, and *People v. Baca*, 633 P.2d 528 (Colo. App. 1981), in equating a lack of recollection with a denial, asserting that the statement in *Davis v. People*, 2013 CO 57, ¶ 7 n.2, to this effect is noncontrolling dicta. While we reject this invitation, we note that it is beside the point because the statute does not require that the witness deny the statement before it can be considered for substantive purposes. *See Montoya v. People*, 740 P.2d 992, 998 (Colo. 1987).

[8] The magazine was attached to the gun when it was found, so our reference to the gun includes both the gun and the magazine.

that the gun and magazine were found in a vehicle L.E.R-N. was driving; (2) Perez's trial testimony that the gun was not his and was already in the car when he got in; and (3) the social media posts showing L.E.R-N. holding a gun that the juvenile court found was "very similar by appearance" to the gun found in the car.

¶ 46    L.E.R-N. attempts to discount the presence of the gun in the car he was driving by arguing that fact does not *necessarily* prove the gun was in his actual or physical control. *See Allgier*, ¶ 65. But the question in a sufficiency analysis is not whether the evidence *necessarily* proves the juvenile's guilt. The question is whether a rational trier of fact could accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *K.D.W.*, ¶ 38.

¶ 47    And the presence of the gun in the car did not stand alone. Added to that fact was Perez's testimony that (1) he and L.E.R-N. were the only ones in the car; (2) no one else drove the car that day; (3) the gun did not belong to Perez; (4) the gun was in the center console; and (5) the gun was already in the car when Perez got in. A reasonable fact finder could infer from these circumstances that L.E.R-N. knowingly possessed the gun. *See People v. Chase*, 2013

COA 27, ¶ 50 ("If there is evidence upon which one may reasonably infer an element of the crime, the evidence is sufficient to sustain that element."); *see also United States v. Moody*, 2 F.4th 180, 193 (4th Cir. 2021) (holding that defendant's status as the driver of the vehicle in which the gun was found was "relevant to her knowledge and ability to exercise dominion and control over" the gun).

¶ 48 L.E.R-N. also attacks the strength of the social media posts on several fronts. He points out that there was no evidence that the guns in the photos were the same gun found in the vehicle, and he points to several claimed discrepancies between the guns to suggest they were not. He highlights the lack of any evidence of when the photos were taken or when one of them was posted. And he disputes whether it was him holding the gun in the photos at all.

¶ 49 But all these challenges go to the weight of the social media posts — a matter within the province of the juvenile court. *See K.D.W.*, ¶ 38 (noting that we may not resolve disputes or inconsistencies in the evidence). What matters for our purposes is that the juvenile court found that L.E.R-N. had "posted several photographs of himself brandishing a weapon" that looked "very similar by appearance" to the gun he was charged with possessing.

Having viewed the photos, and giving the prosecution the benefit of every favorable inference to be drawn from those photos, that finding has record support, and we may not second-guess it. *See People v. Harrison*, 2020 CO 57, ¶ 33; *see also People v. Bondurant*, 2012 COA 50, ¶ 58 ("Where reasonable minds could differ, the evidence is sufficient to sustain a conviction.") (citation omitted).

¶ 50    To summarize, viewed as a whole and in the light most favorable to the prosecution, the evidence establishes the following: (1) L.E.R-N. was the driver of the car in which the gun was found; (2) the only other occupant of the car did not put the gun in the car; (3) the other occupant told police that L.E.R-N. handed him the gun; and (4) L.E.R-N. posted photos to social media of him holding a gun that looked similar to the gun found in the car. This evidence is "substantial and sufficient both in quantity and quality to support a conclusion by a reasonable mind" beyond a reasonable doubt that L.E.R-N. possessed the gun and magazine. *B.D.*, ¶ 8.

## IV.    Disposition

¶ 51    The judgment is affirmed.

JUDGE FREYRE and JUDGE SULLIVAN concur.